933 F.2d 899
 59 USLW 2729
 AMERICAN BANK, N.A., a National Banking Association,
Plaintiff-Appellee,
v.
Robert L. CLARKE, Comptroller of the Currency of the United
States; and L. William Seidman, Chairman, Federal
Deposit Insurance Corporation,
Defendants-Appellants.
 No. 90-2273.
 United States Court of Appeals,
Tenth Circuit.
 May 22, 1991.
 
 Jacob M. Lewis, Atty., Appellate Staff, Civ. Div., (Stuart M. Gerson, Asst. Atty. Gen., William L. Lutz, U.S. Atty., Anthony J. Steinmeyer, Robert V. Zener, and Mark B. Stern, Attys., Appellate Staff, Civ. Div., on the brief) Dept. of Justice, Washington, D.C., for defendants-appellants.
 Robert P. McNeill, (Stevan J. Schoen with him on the brief) Albuquerque, N.M., for plaintiff-appellee.
 Before LOGAN and SEYMOUR, Circuit Judges, and SPARR, District Judge.*
 LOGAN, Circuit Judge.
 
 
 1
 The Comptroller of the Currency of the United States has appealed an order of the district court temporarily enjoining him, his officers, agents and employees from closing the American Bank, N.A. American Bank, a national bank operating in Rio Rancho, New Mexico, sought and obtained the injunction following notice from the Comptroller of a pending closure of the bank on the ground that it was insolvent. We ordered an accelerated briefing and argument schedule for the appeal. After oral argument we vacated the preliminary injunction and stayed further proceedings in the district court, stating that our opinion would follow. This is that opinion.
 
 
 2
 The Comptroller argued that the district court erred in issuing the temporary injunction on several grounds, but we address only one which we find controlling: that the Comptroller's determination of insolvency and his decision to appoint a receiver is not subject to judicial review.
 
 
 3
 This action stems from the purchase of American Bank by a group of investors. In 1989, while still under the control of the pre-sale board of directors, American Bank was notified by the Comptroller that an injection of $2.4 million was necessary to bring its equity capital to the minimum regulatory level.[1] A group of investors approached American Bank at this time, offering to purchase all outstanding shares for $200,000 and to inject $2.5 million to solve its equity capital deficiency. As part of the documentation required for approval, the investors submitted to the Comptroller a financial statement using the accounting methods described in Banking Circular 240.[2] The submitted statement contained a goodwill asset valued at $1,173,133. On March 30, 1990, the Comptroller approved the purchase, but warned the investors that American Bank was in very poor condition and that an additional influx of capital might be required. Appellant's App. at 102. In April 1990, the investors completed the purchase of American Bank.
 
 
 4
 In July 1990, three months after the purchase, the Comptroller again examined the financial status of American Bank.[3] The Comptroller determined that the bank had incurred additional losses in its loan and real estate portfolios; he notified the bank that it needed $5.5 million in additional capital to raise its equity capital to a minimally acceptable level. Absent an immediate influx of capital, the Comptroller stated that he would declare American Bank insolvent and appoint the Federal Deposit Insurance Corporation (FDIC) as receiver.
 
 
 5
 The investors did not provide the capital demanded by the Comptroller. Instead, American Bank filed suit in federal district court seeking both a declaration that it had satisfied the Comptroller's capitalization requirements and an injunction against closure. Making an accounting argument, American Bank contended that it was solvent, at least in part because the losses found by the Comptroller in July should have been recognized before the April sale, thereby increasing the amount of goodwill to be reported under Banking Circular 240 to a level necessary to offset any losses. The Comptroller countered that goodwill could not be considered in a solvency determination because it has no ability to absorb losses. The basic underlying argument of the bank, however, was one of contract or estoppel--that the Comptroller induced the investors to put $2,500,000 new capital into the bank by implicitly promising that the sum would be sufficient to keep the bank operating. According to American Bank, the Comptroller should not be permitted to make a new demand for capital so soon after the purchase, and the new owners should be given more time to make the bank profitable.
 
 
 6
 The district court found the bank's arguments persuasive. We do not reach the merits of the bank's claims, however, because we hold the Comptroller's decision to close a bank as insolvent is unreviewable in a pre-closure proceeding.
 
 
 7
 In Adams v. Nagle, 303 U.S. 532, 58 S.Ct. 687, 82 L.Ed. 999 (1938), the Comptroller had ordered banks closed as insolvent and had ordered an assessment against shareholders to pay the banks' debts. The Supreme Court held that the Comptroller's insolvency determinations and the decision to appoint a receiver for a bank were committed to the Comptroller's discretion and therefore not subject to judicial review. The Court stated that the Comptroller's insolvency assessment was a question "[p]lainly ... for the exercise of administrative discretion" born out of the desirability of prompt liquidation. Id. at 540, 58 S.Ct. at 692.
 
 
 8
 American Bank argues that Adams is no longer the law because the Administrative Procedure Act (APA) now permits courts to determine whether the Comptroller's actions taken pursuant to its own regulations are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. See 5 U.S.C. Sec. 706(2)(A). The APA allows any person suffering a "legal wrong ... or adversely affected or aggrieved" by an agency's action to obtain judicial review thereof, 5 U.S.C. Sec. 702, provided that the action challenged either is "made reviewable by statute" or represents a "final agency action for which there is no other adequate remedy in a court." Id. at Sec. 704. There is an exception to reviewability, however, when "statutes preclude judicial review" or "agency action is committed to agency discretion by law." Id. at 701(a)(1) and (2). No statute either grants or expressly precludes pre-closure judicial review in the instant case; so we must decide whether the Comptroller's decision is action "committed to agency discretion by law." Id.
 
 
 9
 In Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Supreme Court, analyzing the legislative history of the APA, held that Sec. 701(a)(2) applied "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' " Id. at 410, 91 S.Ct. at 821 (quoting S.Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)). The Court in Heckler v. Chaney, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), stated that even absent explicit congressional language precluding review, "review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Id. at 830, 105 S.Ct. at 1655.
 
 
 10
 In Webster v. Doe, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988), an employee who had been discharged for security reasons brought suit against the director of the CIA. After examining the language of the National Security Act of 1947, Sec. 102(c), 50 U.S.C. Sec. 403(c) (NSA), which authorizes the Director to terminate an employee whenever he "shall deem such termination necessary or advisable in the interests of the United States," the Court held that APA Sec. 701(a)(2) precluded judicial review. The Court reasoned that the statute exuded deference to the Director and appeared to foreclose any meaningful judicial review short of permitting cross-examination of the Director's views of national security--a result the Court apparently found infeasible. Id. at 600, 108 S.Ct. at 2052. The Court also determined that the overall structure of the NSA favored precluding review. Id. at 600-01, 108 S.Ct. at 2052-53. The Court stated that the responsibility given the Director under the NSA required that courts give his termination decisions extraordinary deference to protect all sources of intelligence information from disclosure. Id. at 601, 108 S.Ct. at 2052.
 
 
 11
 The "commitment to agency discretion" exception is not limited to cases in which there is "no law to apply." "Whether and to what extent a particular statute precludes review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." Block v. Community Nutrition Inst., 467 U.S. 340, 345, 104 S.Ct. 2450, 2453-54, 81 L.Ed.2d 270 (1984). In ICC v. Brotherhood of Locomotive Engineers, 482 U.S. 270, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987), the Court held that the ICC's refusal to reopen and reconsider an order was judicially unreviewable under APA Sec. 701(a)(2) because such decisions were traditionally unreviewable. Id. at 278-84, 107 S.Ct. at 2365-69. It determined that Congress did not intend to significantly alter the ICC's preexisting rule in enacting the APA. The Court also emphasized that agency action does not automatically become reviewable just because the agency gives a " 'reviewable' reason for otherwise unreviewable action." Id. at 283, 107 S.Ct. at 2368.
 
 
 12
 In Southern Ry. Co. v. Seaboard Allied Milling Corp., 442 U.S. 444, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979), shippers sought judicial review of the ICC's refusal to investigate a seasonal rate increase proposed by a group of railroads. In finding the ICC's refusal unreviewable, the Court pointed to several factors. First, the Court noted that the statutory language creating the ICC's investigatory power was discretionary and was silent on what factors should guide the ICC's decision.[4] Id. at 455, 99 S.Ct. at 2394. Second, the Court stated that the structure of the Interstate Commerce Act indicated that Congress intended to prohibit judicial review. The Court noted that when Congress intended judicial review, it typically used mandatory language such as "shall be the duty of the Commission to investigate" and included standards to guide both the ICC and reviewing courts. Id. at 456, 99 S.Ct. at 2395. Finally, the Court stated that the legislative history of the discretionary statute showed that it was enacted to avoid judicial determination of the lawfulness of rates and to vest primary jurisdiction over such matters with the ICC. Id. at 459-60, 99 S.Ct. at 2396-97.
 
 
 13
 Many of the factors relied upon by the Supreme Court in holding other agency action nonreviewable under the narrow Sec. 701(a)(2) exception are relevant to the instant case. First, the language of the statute authorizing the Comptroller to appoint a receiver in cases of insolvency is highly discretionary. The controlling statute provides that "whenever the Comptroller shall become satisfied of the insolvency of a national banking association, he may, after due examination of its affairs, in either case, appoint a receiver, who shall proceed to close up such association." 12 U.S.C. Sec. 191. Such permissive language exudes strong deference to the Comptroller's decision.
 
 
 14
 Further, provisions added by 1989 amendments to the National Bank Act Sec. 203, 12 U.S.C. Sec. 203, permit review of actions taken by the Comptroller in dealing with troubled banks, but only post-closure, not pre-closure. Section 203(a) states that "[t]he Comptroller of the Currency may, without notice or prior hearing, appoint a conservator ... to take possession and control of a bank whenever the Comptroller determines that one [of several] circumstances exist[s]." Section 203(b) then declares that within twenty days "after the initial appointment" suit may be brought to terminate the appointment. It would be inconsistent with the structure of the Act for us to find that a prior hearing is allowed before the Comptroller may act under Sec. 191, but not before he acts under Sec. 203.
 
 
 15
 Finally, and most importantly, the nature of the agency action involved in this case convinces us that judicial review is precluded. Agency action under Sec. 191 is precipitated by a single event--insolvency. It is true, as American Bank contends, that there are standards, under the Comptroller's own regulations and as developed under bankruptcy law, to judge when an entity is insolvent. Such a determination, however, may require an analysis of essentially all of the assets and liabilities of the bank--requiring courts to go through the time consuming process of reviewing all factual decisions made by the Comptroller. Yet, when a bank is insolvent, the Comptroller must act quickly to minimize current losses and prevent future losses caused by reactionary run-on-the-bank customer withdrawals. By enacting Sec. 191, Congress sought to achieve these goals by authorizing the Comptroller to close an insolvent bank quickly and take expeditious steps necessary to reopen and resume customer service and minimize further loss. Judicial intervention to prevent or postpone closure would reduce the Comptroller's ability to respond to the complex and rapidly changing circumstances of banking activity. We must agree with the following comments of a sister circuit when considering the propriety of an injunction against the Office of Thrift Supervision (OTS) to prevent it from closing a savings and loan association:"[The OTC's] ability to preserve assets in the face of insolvency, whether caused by corruption, mismanagement, or just plain bad luck would be significantly undermined if courts could enter injunctions that would prevent the appointment of a conservator or receiver without prior permission of a court. The only purpose that we can see for giving the Director the power to appoint a conservator or receiver without prior permission in the first place is to free the OTS of having to get permission of a court before acting."
 
 
 16
 First Federal Savings Bank & Trust v. Ryan, 927 F.2d 1345, 1357 (6th Cir.1991).
 
 
 17
 Though less spectacular than other bank closure situations reported in the news nearly every day, the instant case is a good example of the problems of pre-closure judicial review. The Comptroller's examiners determined that American Bank had an equity capital deficit of $4.355 million and was losing more than $15,000 every business day. By enjoining the Comptroller's closure activity, the district court permitted American Bank to continue in a negative financial state with mounting debt. Although the record indicates no adverse customer reaction, if the Comptroller's determination is correct the FDIC insurance fund will incur additional losses each day the bank remains open. Clearly, this is something Congress would have wanted to avoid.
 
 
 18
 None of the cases cited by American Bank to support its argument for judicial review directly address the issues presented in this case. Golden Pac. Bancorp v. Clarke, 837 F.2d 509, 512 (D.C.Cir.), cert. denied, 488 U.S. 890, 109 S.Ct. 223, 102 L.Ed.2d 213 (1988), and FDIC v. Irwin, 916 F.2d 1051, 1054 n. 4 (5th Cir.1990), in dicta raised the prospect of judicial review. Neither case, however, suggests that any such review may be conducted before closure or justifies an injunction against closure ordered by the Comptroller. We express no opinion on what post-closure review may be available to American Bank, as that issue is not before us.
 
 
 19
 We reaffirm our order vacating the district court's preliminary injunction and we remand to the district court for further proceedings consistent with our opinion herein.
 
 
 
 *
 The Honorable Daniel B. Sparr, United States District Judge for the District of Colorado, sitting by designation
 
 
 [1]
 The Comptroller determined this figure by adding (1) an amount necessary to balance the bank's assets and liabilities, (2) a provision to the allowance for loan and lease losses (ALLL) sufficient to absorb anticipated losses inherent in the bank's loan portfolio, and (3) sufficient funds to bring the bank's equity capital to a level equal to five percent of total assets. Appellant's App. at 30
 
 
 [2]
 Banking Circular 240 describes the Comptroller's accounting policies in cases involving acquisitions of national banks, state member banks, and insured state nonmember banks. The accounting policy, referred to as push down accounting, is described as follows:
 "To apply push down accounting, capital accounts of the acquired bank must be adjusted to equal the purchase price. The purchase price is the total cash, stock, debt and other consideration paid to acquire the voting stock of the bank. After the push down adjustments, total capital--stock and surplus--of the bank will equal the price paid by the purchaser. Undivided profits must be recorded at zero as in the formation of a new bank.
 Asset and liability accounts of the acquired bank are adjusted to equal their fair value amounts. To the extent the purchase price exceeds those fair value amounts, the excess should be recorded on the books of the acquired bank as intangible assets ["goodwill"]. However, in no case should the net assets recorded at fair value exceed the purchase price."
 Comptroller of the Currency, Banking Circular 240 (Sept. 7, 1989); Appellant's App. at 63.
 
 
 [3]
 Testimony at the district court's hearing was that the Comptroller had last examined the bank in March 1989. Thus, he argued that the July 1990 examination reflected deterioration over a fifteen-month period
 
 
 [4]
 The statute provided, in pertinent part:
 "[T]he Commission may, upon the complaint of an interested party or upon its own initiative, order a hearing concerning the lawfulness of such rate.... The hearing may be conducted without answer or other formal pleading, but reasonable notice shall be provided to interested parties."
 49 U.S.C. Sec. 15(8)(a) (repealed 1980). Several circuit court cases have held agency action unreviewable based on similar discretionary language in other statutes. See, e.g., Rasmussen v. United States, 421 F.2d 776, 779-80 (8th Cir.1970) (Postmaster General's decision under statute providing that he "may reduce or discontinue [railroad] service" held unreviewable); Knight Newspapers, Inc. v. United States, 395 F.2d 353 (6th Cir.1968) (Postmaster General's decision to refund postage was unreviewable); Chernock v. Gardner, 360 F.2d 257, 258-59 (3d Cir.1966) (language in the Social Security Act stating that the Secretary "may ... prescribe the maximum fees that may be charged for services performed in connection with any claim" precludes judicial review of the rates set by the Secretary).