**Esdras S. TULINGAN, Appellant,**

v.

**Jesse BROWN, Secretary of Veterans Affairs, Appellee.**

No. 95–59.

United States Court of Veterans Appeals.

Oct. 24, 1996.

Esdras S. Tulingan, pro se.

Mary Lou Keener, General Counsel; Ron Garvin, Assistant General Counsel; R. Randall Campbell, Deputy Assistant General Counsel; and Peter M. Donawick, Washington, DC, were on the pleadings for the appellee.

Before NEBEKER, Chief Judge, and KRAMER and FARLEY, Judges.

NEBEKER, Chief Judge, filed the opinion of the Court, FARLEY, Judge, concurring in the result, and KRAMER, Judge, dissenting in part, filed separate opinions.

NEBEKER, Chief Judge:

The appellant, Esdras S. Tulingan, appeals an April 21, 1994, decision of the Board of Veterans' Appeals (BVA or Board) which sustained a forfeiture of benefits invoked against him for his membership in the Bureau of Constabulary (BC) under 38 U.S.C. § 6104(a). Record (R.) at 5–13. The Court will affirm the BVA decision for the following reasons.

## I. FACTS

Mr. Tulingan had recognized guerilla service in the Philippines from August to September 1942. R. at 51. The service department further certified that he was in a nocasualty status from September 1942 to February 1945, and that he had another period of recognized guerrilla service from March 1945 to February 1946 and Philippine Army service from February to March 1946. *Ibid.* The veteran reported that he was wounded by a bullet in the upper left thigh in June 1945. R. at 43.

Tulingan was granted service connection for the wound in 1949. R. at 59. In applying for compensation, he had denied "rendering assistance to an enemy of the United

States or of its allies," and further denied having "taken an oath, made an affirmance or any other declaration of allegiance to a foreign state". R. at 29–30. He subsequently admitted to membership in the BC, from December 1943 to November 1944. R. at 70–71. Tulingan stated that he had been "threatened and intimidated by the Japanese Army to join the [BC], but before joining [he] consulted his [guerrilla unit commander] who advised [him] to join said BC in order to assist better the uncaptured guerrillas in their operations." *Ibid.* Shortly afterward, VA sent a letter to him, requesting additional information regarding the circumstances surrounding his BC membership. R. at 74–75. Attached to the letter was an October 1944 report from Major R.W. Volckmann of the U.S. Army Headquarters in North Luzon, Philippines. R. at 77–78. The report gave an account of the BC's activities in North Luzon and stated that membership in the BC was voluntary. *Ibid.* Tulingan responded in an affidavit, reiterating what he had earlier said, i.e., that he had been forced to join the BC in the province of Nueva Vizcaya. R. at 90–91. Tulingan also submitted an affidavit by Guillermo P. Aban, which stated that Tulingan had first consulted him about joining the BC, and that he, as a commanding officer of a guerrilla unit, had given consent for Tulingan to join the BC as long as he remained faithful to his country and continued to undertake certain missions for the guerilla unit. R. at 80–81. Tulingan also submitted an affidavit by Ramon A. Alcaraz (whom Tulingan later identified as a senior inspector of the BC (R. at 160)), which stated that he had personal knowledge that the appellant was planted in the BC with the consent of the guerrilla unit's commanding officer, Guillermo Aban, and that Tulingan had helped the guerrillas despite being connected with the BC. R. at 84. Tulingan submitted yet another affidavit by Benjamin S. Coloma, who reported that he had served in the same unit between July and September 1942, that they were both captured by the Japanese, and that he had "later learned" that Tulingan had been forced to join the BC. R. at 87. Coloma also stated that Tulingan had remained loyal to and in contact with the guerrilla unit and that, while in the BC, Tulingan had personally reported to him on activities of the enemy. *Ibid.*

The VA Central Office Committee on Waivers and Forfeitures concluded that Tulingan's eligibility for VA benefits was forfeited due to his rendering of assistance to an enemy. R. at 94–95, 97–98, 100, 102, 104; Suppl. R. at 2, 4, 6–7. The BVA affirmed the Committee's decision and found that Tulingan had been guilty, either directly or indirectly, of rendering assistance to an enemy of the U.S. or its allies, and that he thereby forfeited all accrued or future benefits under the laws administered by VA. R. at 111–12.

VA restored Tulingan's eligibility for benefits in 1965. R. at 117. However, fifteen years later that eligibility was again terminated because the reinstatement was found clearly and unmistakably erroneous. Supplemental (Suppl.) R. at 16. Tulingan attempted to regain his eligibility with additional evidence. R. at 133. He submitted additional affidavits from Messrs. Alcaraz and Aban. R. at 146, 157–58. He also submitted a joint affidavit from Laureto Alava and Brigido Serapion dated in January and March 1989, which reported that they had served in the BC with him and that they all had been "planted" with the consent of their commanding officer, Mr. Aban, in the BC as "intelligence and cover agents." R. at 154–55. Tulingan also submitted extracts of service orders relating to a sabotage battalion (guerrilla unit) of which Mr. Aban was commander, Mr. Alcaraz was company commander, and Tulingan was a member as of December 1943. R. at 137, 140–43, 149–50. The RO informed the appellant that the additional evidence submitted was not new and material because it was repetitive and cumulative of the evidence previously considered. R. at 152. Tulingan filed a Notice of Disagreement in March 1989. R. at 152. The RO confirmed the decision in June 1990. Suppl. R. at 20–23. Tulingan appealed to the BVA, which concluded that the additional evidence submitted by him was not new and material evidence. R. at 195–96. This Court, in 1993, vacated the BVA decision, and remanded the matter. *Tulingan v. Brown,* U.S. Vet.App. No. 91–1524 (mem.

dec. Mar. 15, 1993). The Court concluded that Tulingan had submitted new and material evidence, and that the BVA must reopen the claim and evaluate it in light of all the evidence, both old and new. *Ibid.*

The BVA then remanded the claim to the RO for a de novo review. R. at 203–05. The RO denied a revocation of the May 1980 forfeiture decision (R. at 208–10), and returned the case to the BVA. The BVA then reviewed the evidence of record and sustained the forfeiture. R. at 5–14.

## II. ANALYSIS

### A. "Clearly Erroneous" Analysis

■ The Court reviews the BVA's findings regarding forfeiture as a question of fact under the "clearly erroneous" standard of review. *Villaruz v. Brown,* 7 Vet.App. 561, 565 (1995); *Wood v. Derwinski,* 1 Vet.App. 190, 192 (1991); *Gilbert v. Derwinski,* 1 Vet. App. 49, 52–53 (1990). "[T]his Court is not permitted to substitute its judgment for that of the BVA on issues of material fact; if there is a 'plausible basis' in the record for the factual determinations of the BVA ... [the Court] cannot overturn them." *Gilbert,* 1 Vet.App. at 53. Additionally, the BVA must provide an adequate statement of reasons or bases for such findings, including a clear analysis of the evidence which it finds persuasive or unpersuasive with respect to that issue. *Id.* at 57. The Court holds that there is a plausible basis in the record for the BVA's findings, and that the reasons and bases for its decision are adequate. *Gabrielson v. Brown,* 7 Vet.App. 36 (1994).

Section 6104(a) of title 38, U.S.Code, provides as follows:

(a) Any person shown by evidence satisfactory to the Secretary to be guilty of mutiny, treason, sabotage, or rendering assistance to an enemy of the United States or of its allies shall forfeit all accrued or future gratuitous benefits under laws administered by the Secretary.

38 U.S.C. § 6104(a). The record reflects, and Tulingan does not deny, that he was a member of the BC from December 1943 to November 1944. R. at 70–71; Appellant's Br. at 1, 5. The Board, in relying on the October 1944 report, stated:

The [BC] has been recognized as having been part of the Japanese military occupation and administration, and as part of the Japanese Imperial Forces. Members of the [BC] were sent for training, and as reported by headquarters staff of the [U.S.] Army in October 1944, were comprised of enlistees and volunteers. These persons who were members of the [BC] helped Japanese Forces control the local population, made pledges of allegiance to the Japanese Government, were issued weapons, and were sometimes used against American forces.

R. at 12. The BVA then concluded by inference that the appellant had made "an oath of allegiance to an organization which was under the control and domination of a foreign power, and which was at war with the United States." R. at 12.

By Tulingan's own affidavit, he was a member of the BC in Nueva Vizcaya. R. at 77. There is no geographical question (Op. *infra* at 493), as judicial notice of any reputable map of the Philippines, finds the province in question to be part of the north Luzon island, the same area at issue in the Report. R. at 160; *see* NATIONAL GEOGRAPHIC ATLAS OF THE WORLD, 82. (6th ed.1992). Moreover, as relied upon by the Board, the Report pointed out that the BC's members included "younger persons who adopted this method of securing a living, [and further] that there was not known to have been a single case in which a person was physically or mentally coerced into joining the [BC]." R. at 9.

■ The Board rejected Aban's affidavit and the extracts of service orders relating to a sabotage battalion on the grounds that the sabotage battalion was not a recognized guerrilla unit and that, because Tulingan had no recognized guerrilla service during this period, he could not have been planted in the BC on behalf of an official Philippine or American unit. R. at 13. The Board rejected Coloma's affidavit because the BVA found that he had no personal knowledge relating to Tulingan's enlistment in the BC. *Ibid.* The Board rejected the affidavits from Alcaraz, Alava, and Serapion after considering their

participation in the BC, and finding that their statements were "extremely self-serving and ... not credible." *Ibid.* It is the function of the Board, not this Court, to ascribe weight to evidence. *Owens v. Brown,* 7 Vet.App. 429 (1995). The Board found that Tulingan "was guilty of rendering assistance to an enemy of the United States," and that therefore the weight of the evidence was against the claim for revocation of the forfeiture. R. at 7. While our earlier remand here was based upon the finding of new and material evidence, we now look upon these decisions in a different context: where a veteran has lost his status as a benefits-eligible claimant, he must establish it anew by a preponderance of the evidence. *See Villeza v. Brown,* 9 Vet.App. 353, 356–57 (1996). From the record, there appears a "plausible basis" for the Board's determination, and therefore, the Court finds no error in the Board's decision. *Gilbert,* 1 Vet.App. at 53.

### B. Exercise of Jurisdiction

█ Judge Farley's concurrence harkens to the language in 38 U.S.C. § 6104(a) ("evidence satisfactory to the Secretary"), which preexisted the Veterans' Judicial Review Act (VJRA), Pub.L. No. 100–687, 102 Stat. 4105 (1988) (codified at 38 U.S.C. §§ 7251–7298), as a basis to permit the Court to decline review of the decision in this case. At the time that language was enacted the statute's purpose, whatever else it was, was not to permit a reviewing court to decline review, for as Judge Farley observes, judicial review was prohibited. The question then is whether upon passage of the VJRA the "evidence satisfactory to the Secretary" clause is to be given a new meaning and purpose—one it could not have had upon its earlier enactment. We think not, in view of the plenary grant of the right of judicial review of Board decisions adverse to veterans and other claimants to veterans benefits. If the Court is to have discretion to allow an appeal in forfeiture cases, such power must, in view of the general right of appeal under the VJRA, be specifically granted, as it is in virtually all courts where review is a matter of grace and not right. We are unwilling to read into section 6104(a) such a limitation on the right

of appeal where the Board orders or sustains a forfeiture.

### III. CONCLUSION

Accordingly, upon consideration of the record and the briefs of the parties, the Board's decision of April 21, 1994, is AFFIRMED.

FARLEY, Judge, concurring:

I concur in the conclusions that there is a plausible basis in the record for the Board's factual findings and that those findings are not clearly erroneous. Therefore, I also concur in the judgment which affirms the BVA's ruling that the forfeiture of the appellant's benefits was proper. I must note, however, that this is a begrudging concurrence, one given reluctantly and only because I believe that I am bound to follow the precedential decision in *Villaruz v. Brown,* 7 Vet.App. 561 (1995), which established the route meticulously followed by the Chief Judge in his opinion today.

For my part, I have come to realize that we (I was a member of the *Villaruz* panel) neglected to consider, much less resolve, a determinative threshold issue in *Villaruz.* I now believe that § 6104(a) commits the decision in this matter to the unfettered discretion of the Secretary and that the Court should exercise restraint, decline to review the BVA decision, and dismiss this appeal.

### I.

The principle of judicial review was established (perhaps "presumed" is the better word) by Chief Justice Marshall in 1803 in the landmark decision of *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). However, "[t]hroughout the 19th century, the [Supreme] Court resolved questions of reviewability of agency actions by applying a presumption of unreviewability." 3 KENNETH C. DAVIS & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 17.5 (3d ed.1994). The Supreme Court did review some agency actions during the first part of the 20th century in limited circumstances, *see, e.g., American School of Magnetic Healing v. McAnnulty,* 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90 (1902), and in 1967, the Court adopted a presumption of reviewability. *Ab-*

bott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); see also 3 DAVIS & PIERCE, supra, § 17.6. Since that time, the general rule has been that decisions by agencies of the Executive Branch are subject to judicial review.

As is the case with general rules, however, there are exceptions to this rule of reviewability. Courts would not and could not undertake judicial review of agency action where such review was proscribed by statute or where the decision was committed to the sole discretion of the agency. One commentator has described the latter as embracing "actions that are exempt from review because of judicial self-restraint." Ronald M. Levin, Understanding Unreviewability in Administrative Law, 74 MINN. L.REV. 689, 691 (1990). For an example of preclusion by statute, we need look no farther than the history of veterans benefits adjudications. Prior to the 1988 enactment of the Veterans Judicial Review Act (VJRA), Pub.L. No. 100–687, 102 Stat. 4105, decisions on veterans benefits were not subject to review outside the Veterans' Administration. See 38 U.S.C. § 211(a) (1987) ("[T]he decisions of the Administrator [ (now the Secretary) ] on any question of law or fact under any law administered by [VA] providing benefits for veterans and their dependents or survivors shall be final and conclusive and no other official or any court of the United States shall have power or jurisdiction to review any such decision by an action in the nature of mandamus or otherwise.").

The committed–to–agency–discretion exception is "very narrow," applicable in those rare instances where " 'statutes are drawn in such broad terms that in a given case there is no law to apply.' " Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (quoting S. REP. No. 752, 79th Cong., 1st. Sess. 26 (1945)). More recently, the Supreme Court has stated:

> [E]ven where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. In such a case, the statute ("law") can be taken to have "committed" the decisionmaking to the agency's judgment absolutely.

Heckler v. Chaney, 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985) (emphasis added). The committed–to–agency-discretion exception also includes situations where

> [c]omplete administrative authority and decisionmaking freedom is ... created by operation of law. For certain categories of administrative decisions, tradition or common law has evolved unreviewable discretion. Or constitutional theory might operate to deprive the judiciary of a role in certain types of administrative decisions.

2 CHARLES H. KOCH, JR., ADMINISTRATIVE LAW AND PRACTICE § 9.35[2] (Supp.1996). Two oft–cited examples of decisions committed–to–agency–discretion are (1) matters of national security and (2) the exercise of prosecutorial discretion. See Webster v. Doe, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) (national security); Heckler, 470 U.S. at 831, 105 S.Ct. at 1655 ("This Court has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion.").

The two exceptions to the rule of reviewability, statutory preclusion, and committed–to–agency–discretion, which Professor Davis has referred to as part of the "common law" of judicial review of agency action, 5 KENNETH C. DAVIS, ADMINISTRATIVE LAW TREATISE § 28:5 (2d ed.1984), were codified in the Administrative Procedures Act (APA). Section 701(a) of title 5, U.S.Code, provides that there shall be judicial review "except to the extent (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." Although the APA served as a model for at least some sections of the VJRA, compare 5 U.S.C. § 706(2)(A)–(D) with 38 U.S.C. § 7261(a)(3)(A)–(D), Congress did not expressly state in the VJRA that there is no judicial review where there is a statutory prescription or a commitment to agency discretion. However, with regard to the former exception, such a definitive proscription would hardly have been necessary

since the VJRA was enacted to eliminate just such a statutory ban. *See* 38 U.S.C. § 511; 134 CONG. REC. 31,461 (1988) (statement of Sen. Cranston) (stating that the bill which became the VJRA "will afford veterans the opportunity for judicial review....").

Regarding the committed-to-agency-discretion exception, 38 U.S.C. § 7261 does authorize and direct that the Court overturn decisions of the Board which are found to constitute an *"abuse* of discretion." 38 U.S.C. § 7261(a)(3)(A) (emphasis added). However, the "abuse of discretion" standard cannot be contorted into global review authority, or stretched to allow the Court to review matters where "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler,* 470 U.S. at 830, 105 S.Ct. at 1655. As the Supreme Court went on to hold in *Heckler:* "[I]f no judicially manageable standards are available for judging how and when an agency should exercise its discretion then it is impossible to evaluate agency action for 'abuse of discretion.'" *Ibid.; see also* 2 KOCH, *supra,* § 9.34 (in distinguishing 5 U.S.C. § 706, the APA provision which contains the different standards of review, from 5 U.S.C. § 701(a)(2), some "programs ... use the term discretion to mean a level of administrative authority and decisionmaking freedom that still leaves some role for the courts [while other] programs ... use the term for administrative authority and decisionmaking so complete as to foreclose any judicial role"). Moreover, as noted above, § 701(a)(2) merely codified the already existing "common law" of judicial review which remains.

## II.

Turning now to the controlling statute in the matter before the Court, 38 U.S.C. § 6104(a), provides:

(a) Any person *shown by evidence satisfactory to the Secretary* to be guilty of mutiny, treason, sabotage, or rendering assistance to an enemy of the United States or of its allies shall forfeit all accrued or future gratuitous benefits under laws administered by the Secretary. [Emphasis added.]

This statute was enacted during World War II as section 4 of the Act of July 13, 1943, 57 Stat. 554–55, which later became 38 U.S.C. § 728. The purpose of the statute is clear:

In short, no person, within the meaning of 38 U.S.C.A. § 728, guilty of the proscribed offenses was, as a matter of right, to continue [to be] eligible to receive benefits from the government of the nation whose welfare and security in time of war he sought to impair.

*Wellman v. Whittier,* 259 F.2d 163, 167 (D.C.Cir.1958). Similarly, the language itself is clear: "shown by evidence satisfactory to the Secretary." Although it is not relevant here, the drafters used similar language in another sentence in § 4 of the 1943 Act, which, in slightly modified form, became subsection (b) of current § 6104: "the Secretary, in the Secretary's discretion...." 38 U.S.C. § 6104(b).

It is worthy of note that the statute does not require an adjudication of guilt by court martial or other judicial entity before forfeiture of benefits; the decisional responsibility for determining whether a person is "guilty" is placed by the statute upon the shoulders of the Secretary without reference to any other tribunal. As the Tenth Circuit held not long ago, in construing similar language contained in 12 U.S.C. § 191 ("whenever the Comptroller shall become *satisfied* of the insolvency of a national banking association, he may ....";  emphasis added), judicial review was precluded because, inter alia, "[s]uch permissive language exudes strong deference to the Comptroller's decision." *American Bank, N.A. v. Clarke,* 933 F.2d 899, 903 (10th Cir.1991). Congress has not enacted either a definition of or standards for determining the Secretary's satisfaction, and the Secretary has not done so by regulation, which, in either event, could facilitate judicial review. *See Darrow v. Derwinski,* 2 Vet.App. 303, 305–06 (1992); *Smith v. Derwinski,* 1 Vet.App. 267, 278–79 (1991); *see also* 38 C.F.R. §§ 3.900 (1995), et. seq. (containing definitions, delegations of authority, and procedural guidelines but no evidentiary thresholds or decisional standards).

## III.

Decisions on claims for benefits are "subject to one review on appeal to the Secretary.

Final decisions on such appeals shall be made by the Board [of Veteran's Appeals]." 38 U.S.C. § 7104(a); *see also* 38 C.F.R. § 20.101(a) (1995). In its April 21, 1994, decision, the Board stated:

> When viewing the evidence in its entirety, the Board considers the appellant's activity and membership in the Bureau of Constabulary as constituting an extension of the Japanese war effort, as an activity giving aid and assistance to an enemy of the United States.

R. at 13. From this, the Board concluded that "[t]he appellant, beyond a reasonable doubt, was guilty of rendering assistance to an enemy of the United States." R. at 7. As required by § 6104(a), the Board ruled that the appellant had forfeited his right to VA benefits. Unlike the statutes that deal with entitlement to benefits (*see, e.g.,* 38 U.S.C. §§ 1110, 1121, 1131, 1141, 1151), 38 U.S.C. § 6104(a) contains its own peculiar evidentiary standard and, under these circumstances, there simply is, in the words of the Senate report quoted and relied on in *Overton Park,* "no law to apply" and, therefore, no basis for judicial review. To undertake review in such a situation, the Court would have to place itself in the shoes of the Secretary. In my view, that is not review but the impermissible judicial usurpation of a responsibility committed by statute to the Secretary.

There is a second, and perhaps more practical, consideration which also militates against judicial review of this decision under § 6104(a). The Board concluded here, in a phrase intended perhaps more as a description than a standard of review, "beyond a reasonable doubt" that the appellant was shown by evidence satisfactory to the Secretary to have been guilty of rendering assistance to an enemy of the United States. R. at 7. What standard of review are we to apply in reviewing such a determination? Stated another way, how is the Court supposed to measure the Secretary's satisfaction? With a Ouija board? A mood ring?

Appellate court standards of review may properly be viewed along a spectrum of the deference to be accorded the decision and the decisionmaker below. The different standards of review which courts employ in reviewing different types of agency action "may be said to express different levels of tolerance for risk of error." 2 KOCH, *supra,* § 9.2; *see also Miller v. Fenton,* 474 U.S. 104, 113–14, 106 S.Ct. 445, 451, 88 L.Ed.2d 405 (1985) (noting the difficulty in distinguishing a "question of law," a "question of fact," and a "mixed question of law and fact," and stating: "[T]he fact/law distinction at times has turned on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question."). At one end of the spectrum, an appellate tribunal generally reviews matters involving the proper interpretation of the Constitution and statutes on a de novo basis, affording the lower tribunal little or no deference. The assumption is that the higher court is just as, if not more, capable of rendering a detached and informed ruling on the correct interpretation to be accorded the constitutional or statutory words. At the other end of the spectrum lies the standard before us today, where the matter has been committed totally and completely by statute to the agency head: "shown by evidence satisfactory to the Secretary." Absent an allegation that VA has acted under an erroneous interpretation of law or in a manner contrary to the Constitution, *see infra,* complete deference must be afforded the decisionmaker here where "the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely." *Heckler,* 470 U.S. at 830, 105 S.Ct. at 1655. In this instance, this Court has neither reason nor authority to place itself in the Secretary's stead under this statute.

While this issue might appear at first blush to be of only abstract academic interest, the dissenting opinion of Judge Kramer brings it right down to the concrete level. Borrowing from the lyrics of the Rolling Stones of a generation ago, Judge Kramer "can't get no satisfaction" from what he describes as a "preliminary finding" of the Board. However, 38 U.S.C. § 6104(a) renders his relative satisfaction with the evidence of record perhaps of interest but inconsequential as a matter of law.

Judge Kramer concludes that the finding of the Board that the appellant had rendered assistance to an enemy of the United States was clearly erroneous and would vacate the BVA decision and remand for "further development." In effect, he would substitute his evidentiary satisfaction, or lack thereof, for that of the Secretary and, in so doing, undertake a review of the Board's factual findings just as we review such findings in virtually all other BVA decisions, i.e., under the "clearly erroneous" standard. *See* 38 U.S.C. § 7261(a)(4). Due to § 6104(a), however, this appeal is not like the BVA decisions which we review for clear error because the statutory standard is "shown by evidence satisfactory to the Secretary"; it is not "shown by evidence satisfactory *to the Court.*"

All of the above is not to say that a decision under § 6104(a) would never be subject to judicial review. Indeed, as the D.C. Circuit noted almost forty years ago in construing the predecessor to today's statute,

> while 38 U.S.C.A. § 728 authorizes a determination by the Administrator upon "evidence satisfactory to" him, his ruling as we shall develop, is not simply discretionary with him. If it depends upon an erroneous interpretation of law, it may be subject to review by the courts.

*Wellman,* 259 F.2d at 167; *cf.* 38 U.S.C. § 7261(a)(3)(A)–(B) ("hold unlawful and set aside decisions ... by the Secretary ... found to be—... *arbitrary, capricious,* an abuse of discretion, or *otherwise not in accordance of law; ... contrary to constitutional right, power, privilege or immunity* ") (emphasis added). Thus, if the Secretary were to err in defining a term of the statute, e.g., as in *Wellman* (the statutory term "treason"), then review, and reversal, could be had. Similarly, if the Secretary were to decide that benefits were forfeited because the appellant belonged to a particular race, or gender, or nationality, then review, and reversal could be had because such a decision would be "arbitrary, capricious, ... contrary to constitutional right." 38 U.S.C. § 7261(a)(3); *see Webster,* 486 U.S. at 603, 108 S.Ct. at 2053 ("We do not think [the statute which confers discretion upon the

Director of the Central Intelligence Agency] may be read to exclude review of constitutional claims."). However, such variations on this theme are neither presented nor discernible from the record here.

Finally, nothing said above would relieve the Secretary of his obligation under 38 U.S.C. § 7104(d)(1) to include "a written statement of ... the reasons or bases for [the Board's] findings and conclusions, on all material issues of fact and law presented on the record." For this reason, the Court could, at least in theory, entertain a request for judicial review of the statement of reasons or bases which accompanied a BVA decision under 38 U.S.C. § 6104(a). In fact, the dissent engages in just such an exercise. Apparently based upon the implicit assumption that service in the Bureau of Constabulary (BC) is an inadequate predicate for forfeiture on this record, the dissent would remand for "an adequate statement of reasons or bases" as to why "any service in the BC, regardless of circumstances, constitutes rendering assistance to an enemy within the meaning of 38 U.S.C. § 6104(a)." Op. *infra* at 494. I do not happen to find the Board's statement of reasons or bases to be insufficient under 38 U.S.C. § 7104(d) but even if one were to accept that view, judicial review in circumstances such as these would be a triumph of form over substance. If the Court were to find error due to an inadequate statement, the remedy of remand would of necessity be limited to the statement, not the substantive decision. No matter how many times a BVA decision under 38 U.S.C. § 6104(a) returned to this Court, the bottom line would remain the same: the Secretary's decision under § 6104(a), based upon evidence he finds satisfactory to him and without any other statutory or regulatory standards, could not be the subject of meaningful judicial review since there is "no meaningful standard against which to judge the agency's exercise of discretion." *Heckler,* 470 U.S. at 830, 105 S.Ct. at 1655. Therefore, in the context of a decision under 38 U.S.C. § 6104(a), an inadequate statement of reasons or bases would be, at most, an error which would be harmless and not prejudicial to the appellant. *See* 38 U.S.C. § 7261(b).

In his opinion for the Court, the Chief Judge suggests that the words "shown by evidence satisfactory to the Secretary" in 38 U.S.C. § 6104(a) are of no consequence because they were enacted when there was no judicial review. Further, he suggests that, in any event, the words somehow have been overtaken by the spirit of a subsequent enactment, the VJRA. It is indeed true that § 6104(a) was enacted prior to the advent of judicial review during a time when the Secretary served as jury, judge, and court of last resort with respect to claims for veterans' benefits. It is equally true that the era of judicial review was instituted with the passage of the VJRA in 1988. However, for whatever reason or lack thereof, Congress did not change § 6104(a). Without so much as a nod toward judicial restraint, the Chief Judge would undertake to rectify that perceived omission wishing the words away. In my view, such judicial activism would do violence to the "cardinal principle of statutory construction that repeals by implication are not favored." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976); *see also Matsushita Electric Industrial Co. v. Epstein*, — U.S. —, —, 116 S.Ct. 873, 881, 134 L.Ed.2d 6 (1996) ("The rarity with which we have discovered implied repeals is due to the relatively stringent standard for such findings, namely, that there be an irreconcilable conflict between the two federal statutes at issue." [Citations and internal quotes omitted]). The VJRA and § 6104(a) do not present such an "irreconcilable conflict," and while I see no reason why the Court would not be able to review decisions under § 6104(a) just as it reviews other adjudicative decisions, I do not believe that it would be within the province of the Court to elect to ignore operative words in a statute no matter how noble the motives. The responsibility for any corrective action deemed necessary rests with Congress.

### IV.

Here, we are being asked to review a decision reached by the Secretary, through his delegee, the Board of Veterans' Appeals. There is no claim that the decision was based on a misinterpretation of law or that it deprived the appellant of a constitutional right, and the record would not support such claims. Therefore, because this matter has been committed by statute to the Secretary based upon evidence "satisfactory to the Secretary" and there are no standards which would facilitate review or any law to apply, I believe that the Court should decline to review the April 21, 1994, BVA decision and dismiss the appeal.

Although this is an Article I court, it does exercise Article III judicial power. *See Freytag v. Commissioner*, 501 U.S. 868, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991). In exercising self–restraint by not purporting to review the decision here, the Court would be acting well within its mandate and consistent with tradition:

> The judicial power of the United States conferred by Article III of the Constitution is upheld just as surely by withholding judicial relief where Congress has permissibly foreclosed it, as it is by granting such relief where authorized by the Constitution or by statute.

*Dalton v. Specter*, 511 U.S. 462, 464–65, 114 S.Ct. 1719, 1721, 128 L.Ed.2d 497, 512 (1994).

KRAMER, Judge, concurring in part and dissenting in part:

I concur in part II.B., *see Villaruz v. Brown*, 7 Vet.App. 561 (1995), and dissent in parts II.A. and III. The primary issue before the Court is whether the BVA's finding, made pursuant to 38 U.S.C. § 6104(a), that the appellant rendered assistance to an enemy of the United States, thereby forfeiting his right to VA benefits, is clearly erroneous. The Board, relying on the October 1944 report, stated:

> The [BC] has been recognized as having been part of the Japanese military occupation and administration, and as part of the Japanese Imperial Forces. Members of the [BC] were sent for training, and as reported by headquarters staff of the [U.S.] Army in October 1944, were comprised of enlistees and volunteers. These persons who were members of the [BC] helped Japanese Forces control the local population, *made pledges of allegiance to the Japanese Government*, were issued

weapons, and were sometimes used against American forces.

R. at 12 (emphasis added). The BVA then "conclud[ed]" that the appellant took "an oath of allegiance to an organization which was under the control and domination of a foreign power, and which was at war with the United States"; this was a preliminary finding which was a primary basis for the Board's finding that the appellant had rendered assistance to an enemy of the United States. R. at 12.

The October 1944 report, however, does *not* state that members of the BC made pledges of allegiance or oaths to either the Japanese Government or an organization under its control. The report is limited to general observations about the activities of the BC only with respect to North Luzon. R. at 77–78. There is nothing in the report, or otherwise in the record on appeal, that places the appellant's BC activities in North Luzon (including the appellant's affidavit on which the majority relies but which never speaks of North Luzon) or which shows a relationship between the areas of North Luzon and Nueva Vizcaya (the actual area for the appellant's BC activities). Despite the majority's invocation of judicial notice to "illustrate[ ] [that] the province in question [Nueva Vizcaya] . . . [is] part of the northern Luzon island" (*ante* at 486), it is difficult to draw that conclusion from the referenced map. The map shows the province of Nueva Vizcaya as part of Luzon; however, it does not show any area denominated as northern Luzon. In addition, there is nothing in the report that specifically relates to the appellant. In light of the limited scope, geographical and otherwise, of the October 1944 report and the lack of evidence in the record refuting the appellant's denial that he ever gave an oath or other formal declaration of allegiance to a foreign state (R. at 30), the Court should hold that the Board's preliminary finding in this regard is clearly erroneous, *see Gilbert v. Derwinski*, 1 Vet.App. 49, 53 (1990), and should remand the matter to the BVA for development of the circumstances surrounding the appellant's service in the BC. *See* 38 U.S.C. § 5107(a) (where claimant has submitted "evidence sufficient to justify a belief by a fair and impartial individual that the claim is well grounded," Secretary has duty to assist him in developing the facts pertinent to claim). The need for further development is especially true in light of the Board's treatment of the affidavits of Messrs. Aban and Coloma.

The Board rejected Mr. Aban's affidavit and the extracts of service orders relating to a sabotage battalion on the grounds that the sabotage battalion was not a recognized guerrilla unit and that, because the appellant had no recognized guerrilla service during this period, he could not have been planted in the BC on behalf of an official Philippine or American unit. The Court should conclude that this is not an adequate reason or basis to reject the evidence because the affidavit's purpose was not to demonstrate that the appellant was working on behalf of a recognized guerrilla unit, but rather that the appellant was not rendering aid or assistance to an enemy of the United States. *See* 38 U.S.C. § 7104(d)(1); *Gilbert*, 1 Vet.App. at 57 (BVA decisions "must contain clear analysis and succinct but complete explanations" sufficient to inform the claimant and " 'permit effective judicial review' ").

The Board rejected Mr. Coloma's affidavit (although his own loyalty is not in question) because the BVA found that he had no personal knowledge relating to the appellant's enlistment in the BC. Mr. Coloma's lack of knowledge regarding that enlistment is not an adequate reason or basis for rejecting his entire affidavit because it also stated that the appellant had personally reported to him on activities of the enemy while the appellant was in the BC, a statement that if true, would seem to support the appellant's contention that he had joined the BC as a spy and remained loyal to the United States and its allies. *See ibid.* (As to the Board's rejection of the affidavits from Messrs. Alcaraz, Alava, and Serapion, considering their participation in the BC, the BVA's finding that their statements were "extremely self-serving and [ ] not credible," (R. at 13) was plausible, and thus not clearly erroneous. *See Gilbert*, 1 Vet.App. at 53.)

In sum, the evidence of record demonstrates only that the appellant served in the

BC. Assuming further development were not to provide additional light regarding the circumstances surrounding such service, I note that no statute or regulation has been cited, nor am I aware of any, that indicates that, as a matter of law, BC service, per se, constitutes rendering assistance to an enemy within the meaning of 38 U.S.C. § 6104(a). *See Wellman v. Whittier*, 259 F.2d 163, 167–68 (D.C.Cir.1958) (interpreting the predecessor to section 6104(a) and stating that "[t]he strict interpretation necessary as to so drastic a forfeiture statute as [38 U.S.C.] § 728 requires that it be limited to its application to the specific grounds spelled out by Congress, *with clear proof of the overt acts relied upon*") (emphasis added). Thus, any determination to this effect constitutes a factual finding that must be accompanied by an adequate statement of reasons or bases, which the BVA has failed to provide, as required by law. *See Gilbert*, 1 Vet.App. at 57. I would vacate the BVA decision and remand the matter for proceedings consistent with this dissent.