# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 98-1410

KLAUS P. NEUMANN, APPELLANT,

V.

TOGO D. WEST, JR.,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Decided   July 21, 2000   )

*Klaus P. Neumann, pro se.*

*Leigh A. Bradley*, General Counsel; *Ron Garvin*, Assistant General Counsel; *Jacqueline M. Sims,* Acting Deputy Assistant General Counsel; and *Darryl A. Joe*, of Washington, DC, were on the pleadings for the appellee.

Before KRAMER, FARLEY, and HOLDAWAY, *Judges.*

FARLEY, *Judge*, filed the opinion of the Court.  KRAMER, *Judge*, filed a concurring opinion.

FARLEY, *Judge*:  This is an appeal from the July 15, 1998, decision of the Board of Veterans' Appeals (BVA or Board) which denied the veteran's claims for service connection for cubital tunnel syndrome, a skin disorder, and a perception or coordination disorder and remanded the veteran's claims for service connection for headaches, insomnia, breathing difficulties, metallic taste in his mouth, and sensitivity to smells.  This appeal is timely, and the Court has jurisdiction pursuant to 38 U.S.C. § 7252(a).  For the reasons that follow, the Court will affirm the decision of the Board.

1

# I. Background

The veteran served on active duty in the U.S. Army from July 1961 to September 1991. Record (R.) at 17, 159. His many service decorations and campaign ribbons include a Southwest Asia Service Medal with two Bronze Stars. R. at 17.

The veteran's military entrance examination was negative for any pertinent medical conditions. R. at 19-20. His service medial records (SMRs) revealed that he was seen with complaints of eye strain in September 1963 and was referred to the eye clinic for glasses. R. at 22. In June 1964, the veteran was diagnosed with compound myopic astigmatism and congenital color blindness. R. at 27. A September 1968 examination confirmed that the veteran suffered from refractive error and color blindness. R. at 124-25. At some time in the late 1970's, the veteran suffered a superficial corneal abrasion. R. at 81. During a 1985 physical examination, the veteran reported that he had suffered from, inter alia, swollen or painful joints; frequent or severe headaches; ear, nose, or throat trouble; shortness of breath; arthritis, rheumatism, or bursitis; and a painful or "trick" shoulder. R. at 94-95. The examiner also noted that the veteran had a history of multiple musculo-skeletal complaints. R. at 95. No pertinent clinical findings were noted upon physical examination. In September 1988, the veteran reported pain in his left posterior flank radiating to his groin. R. at 126.

The veteran retired from the Army in 1991. R. at 17, 133. At his retirement physical examination in August 1991, the veteran reported a history of, inter alia, swollen or painful joints; frequent or severe headaches; ear, nose, or throat trouble; cramps in his legs; and arthritis, rheumatism, or bursitis. R. at 135. Upon examination, his upper and lower extremities, spine, and musculoskeletal system were all found to be within normal limits; however, the veteran was diagnosed with sciatica on his left side. R. at 133.

The veteran was examined later in August 1991 for complaints of left leg pain and numbness. R. at 139. He reported that while on active duty in Saudi Arabia he experienced sudden onset of numbness over his left lateral thigh which had gradually progressed over the previous months to his left great toe. X-rays were essentially unremarkable. The examiner noted that the veteran did have decreased sensation over the L4 dermatome on the left. An assessment of "[q]uestionable sensory neuropathy of L4 on the left" was made. *Id*. The examiner further reported that it was difficult to

diagnose the veteran's condition in light of the fact that he had no weakness, no reflex changes, or any "of the other hard radicular signs[,] other than he [did have] sensation changes." *Id*. A CT scan of the veteran's lumbar spine indicated that he had "probable left L5-S1 disc herniation." R. at 227-30.

The veteran filed a claim for service-connected benefits in November 1991. R. at 161-64. He claimed that he currently suffered from disabilities related to, among other causes, his service in Saudi Arabia in 1990. R. at 163. In February 1992, the regional office (RO) sent a letter to the veteran requesting that he identify the disabilities he believed he suffered as a result of his service in Saudi Arabia. R. at 170. In a Statement in Support of Claim dated February 12, 1992, the veteran reported, with respect to his service in Saudi Arabia and Kuwait:

> I do not know what the symptoms will be or when or if I [will] ever suffer some lasting damage from that episode, I can imagine that there should be some coating of the airwaves [sic] and lungs. I have further no knowledge [of] how all of this might manifest itself, just like I do not know what effects we will ever suffer from those biological antido[t]e shots that we received while in Saudi.

R. at 174.

The veteran underwent a VA general medical examination on February 11, 1992, at which time he reported a history of exposure to oil smoke during his service in Saudi Arabia. R. at 181-90. The veteran complained of, inter alia, pain and numbness in the anterior left leg, and reported that he had undergone an examination of the lumbar spine in September 1991. Skin and eye examinations were normal. R. at 182. The examiner diagnosed bilateral sensorineural hearing loss and noted that the veteran had reported a history of exposure to asbestos in 1986 and to smoke in 1991. R. at 188. The veteran was given a VA compensation and pension examination in June 1992. R. at 247-67. The examiner noted that the veteran's medical records were not available. R. at 248. Physical examination revealed left and right L5 radiculopathy manifested by decreased sensation to light touch and pinprick. R. at 249. Further testing and evaluation of the lower extremities and the lumbar spine was recommended. R. at 250.

At a peripheral nerve examination in connection with his compensation and pension examination, the veteran reported that he had experienced pain and numbness over his left lower extremity while he was stationed in Saudi Arabia in August 1990. R. at 260. Physical examination

revealed a decreased sensation to light touch and pinprick over the lateral aspect of the left lower extremity and the lateral aspect of the right thigh. R. at 262. The veteran was diagnosed with "[p]robable left L5 radiculopathy and to lesser degree, right L5 radiculopathy related with herniated nucleous pulphosus [sic] located by lumbar 5 vertebrae." R. at 264.

In July 1992, the RO received a letter from the veteran reporting that he was experiencing problems with tingling and itching in his hands. R. at 276. A "Deferred or Confirmed Rating Decision" dated August 13, 1992, notes that this letter was received, but that available service medical records and VA examination records were negative for complaints or treatment regarding the veteran's hands. *Id*. In an August 18, 1992, rating decision, the RO awarded service-connected benefits for a chronic lumbar condition with L5 radiculopathy. R. at 269-70. Service connection for residuals of oil and sand pollution was denied as not shown by the evidence of record. *Id*. The veteran filed a Notice of Disagreement with the RO's denial of his claim for service connection for "health hazards of deployment during Desert Storm/Shield" on August 27, 1992. R. at 278-79.

Later in August 1992, VA wrote to the veteran requesting that he provide further information regarding his problems with tingling and itching in his hands. R. at 282. The veteran responded stating that he had not had any treatment for this condition, but was hoping that VA could explain the nature of his problems. R. at 284. In October 1992, VA again requested further information from the veteran regarding the conditions he believed he suffered as a result of exposure to environmental agents. R. at 289-90. The veteran responded indicating that he had not received any treatment for any such condition and was awaiting the outcome of the VA Persian Gulf registration action. R. at 292. In January 1993, the RO sent the veteran a letter acknowledging his claim for benefits based upon disability resulting from exposure to environmental hazards during his service in the Persian Gulf. R. at 297. In March 1993, the RO again requested that the veteran specify the disability he believed he suffers as a result of his Persian Gulf service. R. at 304. In April 1993, the veteran advised VA that he had undergone a Gulf War physical examination at the Topeka VA Medical Center on March 11, 1993. R. at 306-07.

A May 6, 1993, Deferred Rating Decision noted that the veteran had claimed that he suffered from numbness in his hands and headaches as residuals of exposure to environmental hazards in Saudi Arabia. R. at 314. In June 1993, the RO denied service connection for, among other

disorders, disability manifested by numbness in the hands and headaches secondary to oil smoke or sand pollution.  R. at 325-27, 329-30.

In August 1993, VA sent a letter to the veteran again acknowledging his claim for compensation for disabilities resulting from exposure to environmental hazards in the Persian Gulf. R. at 332.  The letter explained VA's obligation to maintain a registry of veterans who served in the Persian Gulf during the Persian Gulf War.  In September 1993, the veteran responded to the letter indicating his desire to be included in the registry.  *Id.*

The veteran's claims for service connection for a lung condition, numbness in the hands, and headaches were reconsidered in February 1995 because of the new regulations promulgated pursuant to the Veterans' Benefits Improvements Act of 1994, which provided for presumptive service connection for disabilities due to undiagnosed illnesses becoming manifest within two years of service in the Persian Gulf.  R. at 337-41; *see also* 38 U.S.C. § 1117; 38 C.F.R. § 3.317 (§ 3.317 was subsequently amended to be applicable to undiagnosed illnesses manifest "not later than December 31, 2001.).  The RO issued a rating decision dated February 23, 1995, denying the veteran's claims for service connection for a lung condition, numbness in the hands, and headaches, as due to undiagnosed illness pursuant to 38 C.F.R. § 3.317.  R. at 337-41.  On February 21, 1995, the RO received a letter from the veteran requesting that he be evaluated for his conditions under June 1994 protocol guidelines.  R. at 345-46.

In March 1995, the RO received additional VA medical records and a Persian Gulf Registry Code Sheet.  R. at 348-62.  The Persian Gulf Registry Code Sheet indicated that an examination was completed but that no disease was found.  R. at 349.  However, the sheet also indicated that no dermatology, pulmonary, psychiatry, infertility, genetic, parasitology, or culture diagnostic workups were performed.  *Id.*  A March 18, 1993, letter to the veteran reported that his examination and laboratory tests suggested that he was in good health and had no reason to be concerned at that time about possible adverse health effects from exposure to environmental hazards.  R. at 353.

The RO issued a rating decision in August 1995 which, inter alia, confirmed the prior denials of the veteran's claims for service connection for a lung condition, numbness in the hands, and headaches due to an undiagnosed illness.  R. at 372-75.

Later, the VA claims file was augmented by medical records dated 1992 through 1995. R. at 432-58. Records dated in November 1992 noted that the veteran had complained of arthritis since his return from Saudi Arabia. R. at 457. A February 1995 radiological examination of the hands was unremarkable and a radiological examination of the lumbosacral spine showed mild L5-S1 degenerative disc disease. R. at 440. In March 1995, the veteran was treated for carpal tunnel syndrome in his right hand and was fitted for a wrist brace. R at 444. At that time, he reported that he had had tingling in his right hand for the past ten years. *Id*. Test results revealed a medial nerve compression at the wrist on the right and mild axonal polyneuropathy and S1 nerve root pathology, most likely of a chronic nature. R. at 448-49. When the veteran was seen in November 1995, he complained of numbness in his left lower leg and a tingling sensation in his shoulders. R. at 475. The diagnostic impressions were "left herniated and central L5-S1 disc" and rule out herniated cervical disc. *Id*.

A Persian Gulf Registry Code Sheet and examination report dated in February 1996 noted the veteran's complaints of, inter alia, itchy skin, decreased depth perception, and numbness in his right hand. R. at 522-36. His diagnoses included herniated nucleous pulposus with nerve root compression and cubital tunnel syndrome. R. at 528.

In March 1996, the veteran requested a reevaluation of his claims for, inter alia, "Desert Storm related problems." R. at 477. He was given a Compensation and Pension Examination in March 1996. R. at 392-405. He reported that he had experienced episodic numbness of the right second, third, fourth, and fifth fingers since June 1992. He also complained of mild motor weakness in his right hand. A sensory examination revealed decreased sensation to light touch and pinprick in his fingers on his right hand, right hypothenar region, and medial aspect of the forearm. Mental status examination, cranial nerves, coordination, and gait were all within normal limits. R. at 393. The veteran was diagnosed with right ulnar neuropathy and right C2 radiculopathy. R. at 394. Chest x-rays were negative (R. at 395), and the report noted that November 1995 computerized tomography scans of the head and cervical spine were normal (R. at 394). *See also* R. at 411-12.

The veteran underwent a VA general medical examination in September 1996, at which time he complained of, inter alia, problems with depth perception since April 1994 and the sensation of crawling or itching over his upper back since April 1995. R. at 493-94. He also complained of

6

constant back pain with numbness in his left lower extremity and numbness in his right hand. *Id*. His diagnoses included cubital tunnel syndrome with medial nerve entrapment on the right side. R. at 496. Examination of his skin was unremarkable. R. at 495. A neurological disorders examination resulted in diagnoses of right ulnar neuropathy; degenerative joint disease of the cervical spine; and left C2, C5, and L5 radiculopathy. R. at 505. A respiratory examination resulted in a diagnosis of asymptomatic minimal obstructive airway disease. R. at 507-08. The veteran's spine examination resulted in diagnoses of herniated nucleus pulposus at L5-S1 with S1 nerve root entrapment and degenerative disc disease. R. at 509-10. At a vision examination, the examiner diagnosed the veteran with compound hyperopic astigmatism and a history of ocular injury to the cornea in 1950 with no residual effects. R. at 516-17. The examiner also noted in his diagnosis that the veteran had an "[u]nusual visual field complaint centered around frequently not seeing things located in the superior visual field." R. at 517. The veteran had reported that he frequently ran into things that were above his line of sight. *Id*. The examiner noted that another test would be performed to rule out visual field defects. *Id*.

The RO issued a rating decision dated June 24, 1997, which, inter alia, denied the veteran's claims for service connection for the following symptoms as due to an undiagnosed illness or illnesses: (1) cubital tunnel syndrome, (2) headaches, (3) a skin condition, (4) insomnia, (5) an eye disability, (6) breathing difficulty, and (7) metallic taste in his mouth and sensitivity to smells. R. at 610-14, 616-19. The veteran appealed this decision (R. at 623), and testified at a hearing before a VA hearing officer in January 1998 that his pain in his right wrist began when he was stationed in Arizona, prior to his deployment to Saudi Arabia (R. at 668-90). He testified that his condition was first diagnosed in 1995 as carpal tunnel syndrome. R. at 670. He stated that he did not believe that this problem was necessarily related to his Persian Gulf service, but rather just his military work generally. R. at 673. However, he noted that it had become worse during the Gulf War because he was working at a computer for 12 to 18 hours a day at that time. *Id*. With respect to his skin condition, the veteran explained that it was not an external skin condition. R. at 676. He explained that he felt as if bugs were crawling over his skin, but that it was a sensation just below the surface of the skin. R. at 676-77. He further testified that he had not had any skin rashes, just the sensation below his skin that he described. *Id*. With respect to his vision problem, the veteran explained that

he often bumped his head on objects, such as an open cabinet or drawer, above his head. R. at 680. He believed that it was not a vision or depth perception problem, since he was aware that the object was there, yet he still bumped into it. *Id*. He described his problem as more of an inability to control his actions, or simply being sloppy and uncoordinated. *Id*. He stated that he feared that this problem might be psychological. R. at 681.

In February 2, 1998, the hearing officer confirmed the RO's denial of the veteran's claims, and a Supplemental Statement of the Case was issued. R. at 692-703. Thereafter the veteran submitted a letter dated February 15, 1998, wherein he stated that he believed his conditions must have been caused by his military service, because he had never had any other job that could have caused his symptoms. R. at 705. The veteran also stated that his symptoms did not surface until after he left active duty. *Id*. He also complained that the government had neither offered treatment for his conditions, nor provided "any sort of examination to explore the symptoms," despite the fact that he had mentioned the symptoms during previous examinations. *Id*.

On appeal, the Board considered the veteran's claims for service connection for the following symptoms as due to an undiagnosed illness or illnesses: (1) cubital tunnel syndrome, (2) headaches, (3) a tactile sensation (skin) disorder, (4) insomnia, (5) a perception-spatial coordination (eye) disability, (6) breathing difficulty, (7) metallic taste in his mouth, and (8) sensitivity to smells. R. at 1-15. The Board also considered the veteran's claim for service connection for cubital tunnel syndrome on a direct basis. R. at 4. The Board found that further development was required with respect to the veteran's claims for headaches, insomnia, mild obstructive airway disease, metallic taste in his mouth, and sensitivity to smells. R. at 11. Accordingly, those claims were remanded to the RO. *Id*.

With respect to the veteran's claim for service connection for cubital tunnel syndrome as due to an undiagnosed illness pursuant to 38 C.F.R. § 3.317, the Board found that § 3.317 was inapplicable because the veteran's symptoms were attributed to a diagnosed condition, i.e., cubital tunnel syndrome. R. at 8. The Board also found that the veteran had failed to submit a well-grounded claim for service connection for cubital tunnel syndrome on a direct basis because he had presented no medical evidence of a nexus between his currently diagnosed condition and his military service. R. at 10.

8

Finally, the Board denied the veteran's claim for service connection for a perception-spacial coordination disorder and a tactile sensation disability as due to an undiagnosed illness pursuant to § 3.317. The Board found that there was no objective medical evidence or other non-medical indicators that are capable of independent verification establishing that the veteran suffered from either of these conditions. R. at 9. This appeal followed.

## II. Analysis

In his brief, the appellant indicates that he is appealing "all" of the issues appearing on the front page of the Board's July 15, 1998, decision. Of the eight conditions considered by the Board, five were remanded for further development. R. at 11. This Court has jurisdiction to review only those BVA decisions that are final. 38 U.S.C. § 7252(a). In view of the Board's remand of the veteran's claims for service connection for headaches, insomnia, mild obstructive airway disease, metallic taste in his mouth, and sensitivity to smells, the Board's decision with respect to those claims is not final. *See* 38 C.F.R. § 20.1100(b). Thus, the Court does not have jurisdiction over those claims. 38 U.S.C. § 7252(a); *see also Marlow v. West*, 11 Vet.App. 53, 55 (1998). Accordingly, to the extent the appellant intends to appeal the Board's decision regarding his claims for headaches, insomnia, mild obstructive airway disease, metallic taste in his mouth, and sensitivity to smells, his appeal of those claims is dismissed for lack of jurisdiction. *See id.*

*A. Compensation for Disabilities Due to Undiagnosed Illnesses in Persian Gulf War Veterans*

Section 1117 of title 38 of the U.S. Code provides:

(a) The Secretary may pay compensation under this subchapter to any Persian Gulf veteran suffering from a chronic disability resulting from an undiagnosed illness (or combination of undiagnosed illnesses) that --
    (1) became manifest during service on active duty in the Armed Forces in the Southwest Asia theater of operations during the Persian Gulf War; or
    (2) became manifest to a degree of 10 percent or more within the presumptive period prescribed [by the Secretary by regulation].

By the express language of the statute, Congress left to the Secretary the responsibility of promulgating regulations to carry out the statute. 38 U.S.C. § 1117(b), (d). The statute requires that the regulations prescribed by the Secretary include the period of time following service in the

Southwest Asia theater of operations during the Gulf War that such chronic disability must become manifest to qualify for presumptive service connection under this section. 38 U.S.C. § 1117(b). Congress also specifically required the Secretary to promulgate regulations including:

> (A) A description of the period and geographical area or areas of military service in connection with which compensation under this section may be paid.
> (B) A description of the illnesses for which compensation under this section may be paid. [and]
> (C) A description of any relevant medical characteristic (such as latency period) associated with each such illness.

38 U.S.C. § 1117(d)(2). Moreover, although the statute authorizes the Secretary to pay compensation for the types of conditions described, it does not *require* the Secretary to do so. The broad language -- "The Secretary may pay compensation . . ." -- left considerable discretion to the Secretary in setting out the circumstances under which such compensation will be paid. *See Tulingan v. Brown*, 9 Vet.App. 484, 487-89 (1996) (Farley, J., concurring).

Keeping with the mandates of the statute, and its stated purpose of providing compensation to Persian Gulf War veterans suffering from disabilities which could not currently be diagnosed or defined, 38 C.F.R. § 3.317 was thereafter promulgated by the Secretary. *See* Congressional Statement of Purpose Respecting Persian Gulf War Veterans, 38 U.S.C. § 1117, Historical and Statutory Notes. Section 3.317 provides:

> (a)(1) Except as provided in paragraph (c) of this section, VA shall pay compensation in accordance with chapter 11 of title 38, United States Code, to a Persian Gulf veteran who exhibits objective indications of chronic disability resulting from an illness or combination of illnesses manifested by one or more signs or symptoms such as those listed in paragraph (b) of this section, provided that such disability:
> (i) Became manifest either during active military, naval or air service in the Southwest Asia theater of operations during the Persian Gulf War, or to a degree of 10 percent or more not later than December 31, 2001; and
> (ii) By history, physical examination, and laboratory tests cannot be attributed to any known clinical diagnosis.
> (2) For purposes of this section, "objective indications of chronic disability" include both "signs," in the medical sense of objective evidence perceptible to an examining physician, and other, non-medical indicators that are capable of independent verification.
> (3) For purposes of this section, disabilities that have existed for 6 months or more and disabilities that exhibit intermittent episodes of improvement and

10

worsening over a 6-month period will be considered chronic. The 6-month period of chronicity will be measured from the earliest date on which the pertinent evidence establishes that the signs or symptoms of the disability first became manifest.

(4)     A chronic disability resulting from an undiagnosed illness referred to in this section shall be rated using evaluation criteria from part 4 of this chapter for a disease or injury in which the functions affected, anatomical localization, or symptomatology are similar.

(5)     A disability referred to in this section shall be considered service connected for purposes of all laws of the United States.

(b)     For the purposes of paragraph (a)(1) of this section, signs or symptoms which may be manifestations of undiagnosed illness include, but are not limited to:

(1)     Fatigue
(2)     Signs or symptoms involving skin
(3)     Headache
(4)     Muscle pain
(5)     Joint pain
(6)     Neurologic signs or symptoms
(7)     Neuropsychological signs or symptoms
(8)     Signs or symptoms involving the respiratory system (upper or lower)
(9)     Sleep disturbances
(10)    Gastrointestinal signs or symptoms
(11)    Cardiovascular signs or symptoms
(12)    Abnormal weight loss
(13)    Menstrual disorders.

## B. Well-Grounded Claim

Section 5107(a) of title 38, U.S. Code, provides in pertinent part: "[A] person who submits a claim for benefits under a law administered by the Secretary shall have the burden of submitting evidence sufficient to justify a belief by a fair and impartial individual that the claim is well grounded." A well-grounded claim is "a plausible claim, one which is meritorious on its own or capable of substantiation. Such a claim need not be conclusive but only possible to satisfy the initial burden of [§ 5107(a)]." *Murphy v. Derwinski*, 1 Vet.App. 78, 81 (1990). While ultimately the determination by the BVA of whether a claim is well grounded is a matter of law which this Court reviews de novo (*Grivois v. Brown*, 6 Vet.App. 136, 139 (1994)), the decision "rests on factual matters the determination of which by the [BVA] is entitled on review to substantial deference." *Hensley v. West*, 212 F.3d 1255, 1263 (Fed. Cir., May 12, 2000). Findings of fact by the BVA are reviewed under a "clearly erroneous" standard. *See* 38 U.S.C. § 7261(a)(4). While the Court may

11

reverse an incorrect judgment of law which is based upon proper factual findings, "it should not simply [make] factual findings on its own." *Hensley*, 212 F.3d at 1263 (quoting *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)).

The quality and quantity of the evidence required to meet the statutory burden of establishing a well-grounded claim will depend upon the issue presented by the claim. *Grottveit v. Brown*, 5 Vet.App. 91, 92-93 (1993). In order for a claim to be well grounded, there generally must be (1) a medical diagnosis of a current disability; (2) medical or, in certain circumstances, lay evidence of incurrence or aggravation of a disease or injury in service; and (3) medical evidence of a nexus between an in-service injury or disease and the current disability. *Caluza v. Brown*, 7 Vet.App. 498, 506 (1995), *aff'd*, 78 F.3d 604 (Fed. Cir. 1996) (table); *see also Epps v. Brown*, 9 Vet.App. 341 (1996), *aff'd sub nom. Epps v. Gober*, 126 F.3d 1464 (Fed. Cir. 1997), *cert. denied*, 118 S.Ct. 2348 (1998).

Congress has relaxed this burden in certain instances, providing for presumptive service connection where certain statutory requirements are met. *See, e.g.*, 38 U.S.C. §§ 1112 (creating a presumption of service connection for certain diseases "notwithstanding [that] there is no record of evidence of such disease during the period of service"); 1116 (presumptions of service connection for diseases associated with exposure to certain herbicide agents "notwithstanding that there is no record of evidence of such disease during the period of service"). Thus, in order to establish a well-grounded claim for diseases afforded presumptive service connection, the veteran need only present some evidence that the presumptive statute and/or implementing regulation is applicable and that the requirements of that statute and/or regulation have been met. *See, e.g., Brock v. Brown*, 10 Vet.App. 155, 162 (1997) (where a claimant is a Vietnam veteran, thus making 38 U.S.C. § 1116 applicable, all that is required to well ground a claim for a disease afforded presumptive service connection pursuant to that statute is competent evidence of current disability), *aff'd sub nom Brock v. West*, __ F.3d __ (Fed.Cir. 2000) (table); *Goss v. Brown*, 9 Vet.App. 109, 113 (1996) (where the veteran was a prisoner of war, thus making 38 U.S.C. § 1112 applicable, all that is required to well ground a claim for one of the diseases afforded presumptive service connection pursuant to that statute is evidence that the veteran suffered from that condition); *see also* 38 C.F.R. §§ 3.307, 3.309.

Against this background, we must now determine what constitutes a well-grounded claim pursuant to 38 U.S.C. § 1117 and 38 C.F.R. § 3.317. The Secretary urges this Court to adopt a recent VA General Counsel precedent opinion setting forth a test for determining whether a claimant has submitted a well-grounded claim for benefits under 38 U.S.C. § 1117 and 38 C.F.R. § 3.317. In VA Gen. Coun. Prec. 4-99 (May 3, 1999), VA's General Counsel held as follows:

> A well-grounded claim for compensation under 38 U.S.C. § 1117(a) and 38 C.F.R. § 3.317 for disability due to undiagnosed illness generally requires the submission of some evidence of: (1) active military, naval, or air service in the Southwest Asia theater of operations during the Persian Gulf War; (2) the manifestation of one or more signs or symptoms of undiagnosed illness; (3) objective indications of chronic disability during the relevant period of service or to a degree of disability of 10 percent or more within the specified presumptive period; and (4) a nexus between the chronic disability and the undiagnosed illness.

The first, second, and third requirements set forth by the VA General Counsel are unassailable, as they merely echo the regulation. To benefit from the presumption, a veteran must establish that he or she had the requisite service in time and place; he or she suffers from any signs or symptoms of an undiagnosed illness as described in the regulation which cannot be attributed to any known clinical diagnosis; and objective indicia of chronic disability manifested either during service or within the presumptive period to a degree of 10% or more. *See Brock, supra*. Section 3.317 explicitly acknowledges that a claimant's "signs or symptoms" need not be shown by medical evidence; however, the regulation does specifically require some "objective indications" of disability. *See* 38 C.F.R. § 3.317(a). "'[O]bjective indications of chronic disability' include both 'signs,' in the medical sense of objective evidence perceptible to an examining physician, and other, non-medical, indicators that are capable of independent verification." 38 C.F.R. § 3.317(a)(2). Thus, although medical evidence of signs or symptoms is clearly not required to well ground a claim, the regulation does require that there be some objective, independently verifiable evidence of the symptoms. We find these regulatory requirements to be consistent with the legislative intent of Congress as expressed in the clear language of 38 U.S.C. § 1117.

The fourth element proposed by the General Counsel opinion, however, does not demonstrate the same consistency. Indeed, the requirement that a veteran show a "nexus between the chronic disability and the undiagnosed illness" impermissibly adds a limitation to, rather than derives from,

13

the statute and the regulation and thus runs afoul of *Brown v. Gardner*, 513 U.S. 115 (1994) (regulation imposing fault requirement where no such requirement is imposed by its implementing statute is invalid). Congress has made a legislative judgment that, even though a Persian Gulf War veteran's symptoms may not at this time be attributed to a specific disease, they may nonetheless be related to conditions in the Southwest Asia theater of operations and, for that reason, are presumed to be service connected. The purpose of the statute, which is carried out in the regulation, was to lessen a Persian Gulf veteran's evidentiary burden with respect to not only the current disability requirement of *Caluza, supra*, but the nexus requirement as well. Thus, signs or symptoms of a chronic disability are afforded presumptive service connection precisely *because* they cannot be attributed to any known clinical diagnosis. If the requirements of the regulation are established, it would be, at best, illogical to require a veteran to obtain a medical opinion that his or her symptoms are causally related to some unknown, undiagnosed, and undiagnosable condition. Thus, this Court will decline to adopt the VA General Counsel opinion regarding 38 U.S.C. § 1117 and 38 C.F.R. § 3.317.

Moreover, there is no need for the VA or for this Court to re-create the standard for establishing a well-grounded claim in this, or any other case where a presumptive statute might be applicable. We decline to join in Judge Kramer's apparent effort to improve upon the regulation in his concurring statement. *Compare Colvin v. Derwinski*, 1 Vet.App. 171 (1991), *with Hodge v. West*, 155 F.3d 1356, 1361-64 (Fed. Cir. 1998) (holding the test created by the Court in *Colvin* to determine whether a claimant has submitted new and material evidence to reopen a claim was unnecessarily stringent and inconsistent with 38 C.F.R. § 3.156(a)). Generally, where a veteran attempts to establish service connection on a presumptive basis, this Court has held that all that need be shown is that the veteran meets the requirements of the presumptive statute and regulation. *See Brock* and *Goss,* both *supra*. Thus, in order to establish a well-grounded claim pursuant to 38 U.S.C. § 1117 and 38 C.F.R. § 3.317, a claimant need only present some evidence (1) that he or she is "a Persian Gulf veteran"; (2) "who exhibits objective indications of chronic disability resulting from an illness or combination of illnesses manifested by one or more signs or symptoms such as those listed in paragraph (b) of [38 C.F.R. § 3.317]"; (3) which "became manifest either during active military, naval or air service in the Southwest Asia theater of operations during the Persian Gulf War,

14

or to a degree of 10 percent or more not later than December 31, 2001"; and (4) that such symptomatology "[b]y history, physical examination, and laboratory tests cannot be attributed to any known clinical diagnosis." 38 C.F.R. § 3.317(a).

### C. Cubital Tunnel Syndrome

To the extent that the veteran argues that his claim for a right wrist condition is entitled to the benefits of the § 1117 presumption, that argument must be rejected. The application of § 1117 has as an explicit condition that the claim be for a "chronic disability resulting from an *undiagnosed* illness." 38 U.S.C. §1117(a) (emphasis added); *see also* 38 C.F.R. § 3.317(a)(1)(ii) ("By history, physical examination, and laboratory tests cannot be attributed to any known clinical diagnosis."). The record shows that the appellant first complained of right wrist pain in July of 1992, which was diagnosed as carpal tunnel syndrome. *See* R. at 276. In 1996, the diagnosis was changed to cubital tunnel syndrome. *See* R. at 528. Because the appellant's symptoms have been "attributed to [a] known clinical diagnosis," the provisions of 38 U.S.C. § 1117 and 38 C.F.R. § 3.317 are not applicable. *See* 38 C.F.R. § 3.317(a)(1)(ii). Thus, the Board properly denied as legally insufficient the appellant's claim pursuant to 38 U.S.C. § 1117 and 38 C.F.R. § 3.317 for service connection for cubital tunnel syndrome as due to an undiagnosed illness. *See Sabonis v. Brown*, 6 Vet.App. 426, 430 (1994).

The Board also found that the appellant had failed to establish a well-grounded claim for cubital tunnel syndrome on a direct basis because the appellant had presented no evidence of such condition while in service or of a nexus between his current condition and his military service. The Court agrees that the record is devoid of any such evidence. Accordingly, on de novo review, we find that the appellant's claim for service connection for cubital tunnel syndrome on a direct basis is not well grounded. *See Hensley* and *Caluza,* both *supra*.

### D. Perception-Spacial Coordination and Tactile Sensation (Skin) Disorders

As discussed above, a well-grounded claim for service connection pursuant to 38 U.S.C. § 1117 and 38 C.F.R. § 3.317 will generally require only evidence that the claimant is a Persian Gulf War veteran and evidence of signs or symptoms of chronic, undiagnosed, disability. Although the evidentiary burden of establishing a well-grounded claim is generally very low (*see Hensley*, __ F.3d at __, slip op. at 11), the regulation implementing § 1117 specifically requires some "objective

indications" of the signs or symptoms of the undiagnosed condition (38 C.F.R. § 3.317(a)(2)). In the BVA decision here on appeal, the Board found that although there is evidence that the veteran had complained of an itching and crawling sensation beneath his skin and a perception or coordination problem, the objective medical evidence failed to show any such disabilities. R. at 9. Moreover, the Board found that the veteran had not offered any objective non-medical evidence that can be verified to support his claims. *Id.* We find that the Board's assessment of this evidence is supported by the record, and that the Board's factual conclusions are therefore not "clearly erroneous." *See Hensley, supra.* Applying this factual determination to the law, we find, on de novo review, that the appellant's claims for service connection for perception-spatial coordination and tactile sensation disabilities due to an undiagnosed illness are not well grounded. *Id.*; *see Caluza, supra*.

### III.  Conclusion

Upon consideration of the foregoing, the July 15, 1998, decision of the Board of Veterans' Appeals is AFFIRMED.


KRAMER, *Judge*, concurring: I concur in the majority opinion. However, I write separately because I believe that, due to the wording of the statute, the regulation, and VA Gen. Coun. Prec. 4-99 (May 3, 1999), as synthesized by the majority, some confusion may arise as to the requisite evidence for well grounding a claim under 38 U.S.C. § 1117 and 38 C.F.R. § 3.317. In sum, this confusion is primarily attributable to the use of multiple tests, such as "objective indications"; "chronic disability"; "illness or combination of illnesses"; "manifested by . . . signs or symptoms"; "such symptomatology"; and "known clinical diagnosis," making both the meaning of each and the relationship of each to the others more difficult to divine than necessary, especially where further reference to § 3.317 is still required. Hence, I am willing to assume the risks inherently associated with interpretation and analysis and, accordingly, offer the following simplified construct, which I believe incorporates the necessary elements of both the statute and the regulation. In my view, a well-grounded claim for compensation under 38 U.S.C. § 1117 and 38 C.F.R. § 3.317 will generally require:  (1) evidence of active military, naval, or air service in the Southwest Asia theater of operations during the Persian Gulf War; (2) evidence of a chronic disability during such service or

16

during the period between discharge and January 1, 2002, as shown by continuous or episodic symptomatology of at least six months duration; and (3) medical evidence indicating that such symptomatology cannot be attributed to any known clinical diagnosis. I believe that use of this construct would simplify the process of comparing the statutory and regulatory requirements and utilizing various discrete subsections within the regulation.