**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 7 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

COLORADO ENVIRONMENTAL
COALITION; COLORADO
MOUNTAIN CLUB; SARAH
PETERS; JOSHUA HOUDEK,

      Plaintiffs - Appellants,

v.

RON WENKER, Colorado State
Director of Bureau of Land
Management;[*] KATHLEEN CLARKE,
Director of the Bureau of Land
Management; GALE NORTON,
Secretary of the Department of the
Interior of the United States; UNITED
STATES BUREAU OF LAND
MANAGEMENT,

      Defendants - Appellees.

No. 02-1254

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 02-Z-760 (MJW))**

---

James Jay Tutchton (Eric E. Huber with him on the briefs), Earthjustice, Denver,
Colorado for Plaintiffs-Appellants.

---

[*] Pursuant to Fed. R. App. P. 43(c)(2) Ron Wenker is substituted for Doug
Koza, who was substituted for Ann Morgan, as Colorado State Director of the
Bureau of Land Management.

Mark S. Pestal, Assistant United States Attorney, (John W. Suthers, United States Attorney, District of Colorado, with him on the brief) Denver, Colorado for Defendants-Appellees.

---

Before **EBEL**, **PORFILIO**, and **O'BRIEN**, Circuit Judges.

---

**PER CURIAM**

---

The Federal Land Policy and Management Act ("FLPMA") of 1976 § 309, 43 U.S.C. § 1739 (amended 1978), and Bureau of Land Management ("BLM" or the "agency") regulations, 43 C.F.R. § 1784.0-1 et seq., require the Secretary of the Interior to create and appoint public members to Resource Advisory Councils ("RACs"). The RACs are designed to be representative of major groups with interests in federal lands, and they make recommendations to the Secretary and the BLM about federal land use policy. This case involves the plaintiffs' challenge to appointments made by the Secretary in 2001 to the three Colorado RACs. The formation and operation of federal advisory committees like the RACs must conform to requirements established by the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. 2 § 5. The plaintiffs allege that the Secretary failed to follow the procedural requirements of the FACA and BLM regulations applying to RACs when making the appointments.

The district court dismissed the case, offering two alternative grounds for its action. The district court concluded both that the FACA and the regulations were too vague to provide a meaningful legal standard to adjudicate the plaintiffs' claims, and that the plaintiffs lacked standing to bring their action. We conclude that the individual plaintiffs Peters and Houdek do have standing to bring this action, and that the "fair membership balance" requirement of 43 C.F.R. § 1784.2-1(a) provides a meaningful legal standard to apply to their claims on that issue. However, we conclude that plaintiffs' first claim alleging a violation of the letter of reference criteria expressed in 43 C.F.R. § 1784.6-1(e) and plaintiffs' second claim alleging a violation of the prohibition against inappropriate influence expressed in the FACA, 5 U.S.C. app. 2 § 5(b)(3) do not present meaningful legal standards against which courts can evaluate those claims. Accordingly, those claims do not present justiciable claims. Thus, we REVERSE the district court's dismissal of count three and AFFIRM the district court's dismissal of counts one and two. We REMAND for further proceedings on count three as to plaintiffs Peters and Houdek.

# BACKGROUND

Among its many provisions relating to federal management of public lands, the FLPMA requires the Secretary of the Interior to establish public advisory councils for the purpose of making recommendations to the Secretary about matters relating to federal land use policy. 43 U.S.C. § 1739(a), (d). Specifically, the Secretary of the Interior is instructed by the statute to

> establish advisory councils of not less than ten and not more than fifteen members appointed by him from among persons who are representative of the various major citizens' interests concerning the problems relating to land use planning or the management of the public lands located within the area for which an advisory council is established.

43 U.S.C. § 1739(a). The advisory councils established by the FLPMA "may furnish advice to the Secretary with respect to land use planning, classification, retention, management, and disposal of the public lands within the area for which the advisory council is established and such other matters as may be referred to it by the Secretary." 43 U.S.C. § 1739(d).

The formation and operation of the advisory councils authorized by the FLPMA must conform to the requirements of the Federal Advisory Committee Act, 5 U.S.C. app. 2 § 4.[1]  See 43 U.S.C. § 1739(a). Advisory committees must

---

[1] Although FACA speaks of advisory "committees" and the entities at issue
(continued...)

- 4 -

have a clearly defined purpose, have a membership that is "fairly balanced in terms of the points of view represented and the functions to be performed," and "not be inappropriately influenced by the appointing authority or by any special interest." 5 U.S.C. app. 2 § 5(b)(2), (3).

To implement the FLPMA's directive that the Secretary of the Interior form advisory committees, the Bureau of Land Management promulgated regulations for such committees. See 43 C.F.R. §§ 1784.0-1–1784.6-2. Consistent with the purpose of the FLPMA, the objective of these regulations is to

> make available to the Department of the Interior and Bureau of Land Management the expert counsel of concerned, knowledgeable citizens and public officials regarding both the formulation of operating guidelines and the preparation and execution of plans and programs for the use and management of public lands, their natural and cultural resources, and the environment.

43 C.F.R. § 1784.0-2. In addition to establishing general standards for any advisory committee formed to advise the Secretary of the Interior, the regulations specifically create "[r]esource advisory councils . . . to cover all lands administered by the Bureau of Land Management." 43 C.F.R. § 1784.6-1. The appointment of members to the three RACs that cover Colorado is at the core of

---

[1](...continued)
in this case are "councils," such councils are clearly intended to be covered by the Act. See 5 U.S.C. app. 2 §3 (defining "advisory committee" to include "any committee, board, commission, council, conference, panel, task force, or other similar group . . . which is . . . established by statute . . . in the interest of obtaining advice or recommendations for . . . one or more agencies . . . .").

the dispute in the instant case. The Colorado RACs provide advice and recommendations to the Secretary and the BLM about management of the 8.3 million acres of public lands, and the 27.3 million subsurface acres available for mineral development, in Colorado. The advice and recommendations of the RACs are not binding upon the Secretary or the BLM. See 43 C.F.R. § 1784.5-1 ("The function of an advisory committee is solely advisory . . . .).

The regulations specify that RACs must contain members "representative of the interests of . . . 3 general groups." 43 C.F.R. § 1784.6-1(c). These three groups are (1) people with interests in federal grazing permits, transportation or rights-of-way, outdoor recreation, commercial timber operations, or energy and mineral development; (2) people representing nationally or regionally recognized environmental groups, "dispersed recreational activities," archeological and historical interests, or nationally or regionally recognized wild horse and burro interest groups; and (3) persons who hold state, county or local elected office, are employed by state natural resources agencies, represent local Indian tribes, are employed as academics in natural resource management or the natural sciences, or represent the affected public-at-large. 43 C.F.R. § 1784.6-1(c)(1)–(3). The three RACs in Colorado have fifteen members each, representing the Front Range, the Northwest, and the Southwest regions.

RAC members are chosen by the Secretary of the Interior. Id. at § 1784.6-1(c). The regulations specify that at least one government official must be appointed to each RAC, id., and "the Secretary shall provide for balanced and broad representation from within each [of the three] categor[ies]" specified in the Regulations. Id. at § 1784.6-1(d). In a provision important to this case, the regulations state that: "[a]ll nominations shall be accompanied by letters of reference from interests or organizations to be represented." Id. at § 1784.6-1(e).

At issue before us are the nominations and appointments made to the three Colorado RACs by the defendants in 2001. On March 9, 2001, the BLM published in the Federal Register a "Call for Nominations for Resource Advisory Councils." On the same day, the BLM's Colorado state office issued a press release publicizing the call for nominations to fill 14 vacancies on the Colorado RACs. An internal BLM policy set the closing date for the nomination process as April 23, 2001, and by that date the BLM had received almost 50 applications, complete with the required letters of reference.

Fifteen days after the close of the nomination period, Colorado Governor Bill Owens submitted to the Colorado Director of the BLM a letter containing a list of 13 nominations to fill the RAC vacancies. The Governor's letter did not include letters of reference from interest groups supporting the individuals listed, nor did it contain any other documentation in support of the nominees. Of the 13

individuals nominated by Governor Owens, only three later submitted to the BLM letters of reference from the interests they purportedly represent. On September 25, 2001, the Colorado office of the BLM issued a press release announcing that Secretary Norton had filled the 14 vacancies on Colorado's RACs. All of the 13 nominees listed in Governor Owens' letter were appointed to RAC positions. Of the approximately 50 public nominees, only one was selected for a RAC position.

Following Secretary Norton's appointments to the RACs, the plaintiffs filed a complaint in the United States District Court for the District of Colorado seeking declaratory and injunctive relief. The plaintiffs are two Colorado environmental organizations and two individuals who applied for, but did not receive, RAC positions. Their complaint alleges that 10 of the 14 appointments to the RACs were unlawful for three reasons. First, the complaint alleges that the appointments were made without the letters of reference required by 43 C.F.R. § 1784.6-1(e) from the interest or organization each nominee was to represent. Second, the complaint alleges that the appointments resulted from inappropriate influence by Governor Owens, in violation of FACA, 5 U.S.C. app. 2 § 5(b)(3). Third, the complaint alleges that appointments did not satisfy the regulations' requirement that RAC membership provide balanced representation within each of the three categories of interests that must be represented on the RACs. 43 C.F.R. § 1784.6-1(d).

Shortly after the complaint was filed, the plaintiffs moved for a preliminary injunction, asking the district court to enjoin RAC meetings from taking place with the challenged appointees. The defendants responded to the motion by filing a "Motion to Dismiss Plaintiff's Motion for Preliminary Injunction."[2] At a hearing on both motions the district court was persuaded by the defendants that the case should be dismissed. The district court ruled

> that plaintiffs lack the requisite standing to pursue their cause of action. Most importantly, they have suffered no injury-in-fact at this time. Furthermore, the Federal Advisory Committee Act, 5 U.S.C. App. 2 § 5, and the corresponding regulations in 43 C.F.R. § 1784, are too vague to provide a meaningful standard of review.

Order & J. of Dismissal of May 30, 2002. The court therefore dismissed the complaint.

The plaintiffs timely filed a notice of appeal and challenged the dismissal of their complaint. They challenge both the district court's conclusion that the applicable statutes and BLM regulations are too vague to decide the case and that they do not have standing to bring this lawsuit. We have jurisdiction pursuant to 28 U.S.C. § 1291.

---

[2] Despite how the defendants styled their motion, it was clearly intended to be, and in fact was treated by the court as, a motion to dismiss the case.

**DISCUSSION**

The defendants moved to dismiss the case under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), but the district court did not specify under which rule it granted the motion to dismiss. Nevertheless, the standard of review is *de novo* whether we treat the appeal as seeking review of a Rule 12(b)(1) or 12(b)(6) dismissal. See U.S. West, Inc. v. Tristani, 182 F.3d 1202, 1206 (10th Cir. 1999) (review of Rule 12(b)(1) dismissal for lack of subject matter jurisdiction is *de novo*); Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999) (review of Rule 12(b)(6) dismissal for failure to state a claim is *de novo*). We choose to treat this appeal as seeking review of a Rule 12(b)(1) dismissal because the two grounds cited by the district court—that the plaintiffs lacked standing and that the statute they sued under does not permit judicial review—are jurisdictional.

## I. Existence of a Meaningful Standard of Review

Judicial review of an agency's compliance with a statute is precluded when the statute is "drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Heckler v. Chaney, 470 U.S.

821, 830 (1985). The defendants argued in their motion to dismiss that the statutes and regulations invoked by the plaintiffs fail to provide a meaningful standard for evaluating the RAC appointment decisions. The district court accepted this argument as one of its reasons for dismissing the case, stating its view that "the Federal Advisory Committee Act, 5 U.S.C. app. 2 § 5, and the corresponding regulations in 43 C.F.R. § 1784, are too vague to provide a meaningful standard for review." We consider this conclusion with respect to each of the three counts in the plaintiffs' complaint.

A.     Count One: Alleged Violation of the Letter-of-Reference Requirement

The first count of the plaintiffs' complaint alleges that ten of Governor Owens' nominees were appointed without a requisite letter of reference from the interest or organization they were to represent. 43 C.F.R. § 1784.6-1(e). The plaintiffs claim the failure to abide by its regulation rendered the agency's appointments "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" under the Administrative Procedure Act, ("APA") 5 U.S.C. § 706(2)(A) & (D). The defendants admit that letters of reference for the Governor's nominees were not submitted with his recommendations, but letters (which were supplied to the district court and are part of the record on appeal) accompanied the nominations sent to the Secretary for decision. Since the letters

of reference were considered by the secretary, they argue, the issue is really one relating to the adequacy of the letters for which the regulation, 43 CFR § 1784.6-1(e), provides no standards and, hence there is no "law to apply," rendering the issue one committed to agency discretion under Section 701 (a)(2) of the APA.

The APA § 701(a) provides an exemption from judicial review for those cases where: "(1) statutes [expressly] preclude judicial review," 5 U.S.C. § 701 (a)(1); "or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701 (a)(2). We agree with the defendants, but from a more global perspective.

Exemption from judicial review of agency decisions is narrow. Heckler v. Chaney, 470 U.S. 821, 830 (1985). Generally, § 701(a)(2) will be applied when a statute or regulation is "drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Id. In such cases, the statute "can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely." Id. The exception, however, is not limited to **only** those cases in which enabling legislation is drawn so broadly there is no law to apply. American Bank, N.A. v. Clark, 933 F.2d 899, 902 (10th Cir. 1991). "Whether and to what extent a particular statute precludes review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history and **the nature of the administrative action**

**involved**." Id. (emphasis added) (quoting Block v. Commty. Nutrition Inst., 467 U.S. 340, 345 (1984)).

"[A]n administrative agency is not a slave of its rules." Health Sys. Agency of Okla. v. Norman, 589 F.2d 486, 490 n.5 (10th Cir. 1978) (internal citation and quotations omitted). Although it is axiomatic that duly promulgated rules will have the force and effect of law, not every agency-made "law" is of such a nature that its violation should invalidate agency action. See French v. Edwards, 80 U.S. 506, 511 (1871). In certain instances, agencies are permitted to waive compliance with their own procedural rules. It is the "nature of the administrative action involved" that provides the foundation for this exception to the reviewability of agency decisions. American Bank, 933 F.2d at 902.

The Supreme Court directly addressed this principle in American Farm Lines v. Black Ball Freight Serv., 397 U.S. 532, 538-39 (1970). There, the Interstate Commerce Commission ("ICC") granted a motor carrier's application for temporary operating authority despite the fact that the carrier's application did not contain certain information required by the ICC's regulations. Competing motor carriers contended that the ICC was required by its own rules to reject the application. In rejecting the competing carrier's position, the Court noted the regulation was adopted to facilitate the ICC's own information gathering and was

"not intended primarily to confer important procedural benefits upon individuals

. . . ." Id. at 538. The Court relied upon the established principle that:

> [I]t is always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it. The action of either in such a case is not reviewable except upon a showing of substantial prejudice to the complaining party.

Id. at 539 (quoting NLRB v. Monsanto Chem. Co., 205 F.2d 763, 764 (8th Cir. 1953)).

Thus, Black Ball Freight carves out a limited exception to the general rule that agencies are required to adhere to their own regulations. This limited exception turns on whether the regulations were intended to confer important procedural benefits upon the parties before the agency or whether they are merely procedural rules for the orderly transaction of agency business. Even if it is determined that the regulations are of the latter type, an agency will be required to adhere to its own regulations where the complaining party will suffer "substantial prejudice" in the absence of such adherence.

With these principles in mind, we turn to the plaintiffs' allegations in count one of their complaint. The controlling statutes, the FLPMA and FACA, are silent as to the materials, if any, the Secretary must review in deciding whom to appoint to advisory committees. The controlling statutes, therefore, provide no

"law to apply" to review the Secretary's decision regarding the appointment of individuals for the Colorado RACs.

However, the agency's regulations governing the appointment of RAC members may also be a basis for their claim. The regulation relied on by the plaintiffs states:

> In making appointments to resource advisory councils the Secretary shall consider nominations made by the Governor of the State or States affected and nominations received in response to public calls for nominations pursuant to § 1784.4-1. Persons interested in serving on resource advisory councils may nominate themselves. All nominations shall be accompanied by letters of reference from interests or organizations to be represented.

43 C.F.R. § 1786.6-1(e).

We must first consider whether this regulation provides "law to apply." The regulation plainly instructs that all nominations shall include: 1) letters of reference, 2) from interests or organizations to be represented. Assuming this language provides adequate guidance to apply judicial review, our inquiry does not end here.[3]

------

[3]Plaintiffs allege the term "shall" in the regulation not only provides a meaningful standard for judicial review, but makes compliance mandatory. While such language indicates required action, it is not dispositive. In French, the Supreme Court considered a statute stating the sheriff "shall" take certain actions in a tax sale of property. 80 U.S. at 511-12. Nonetheless, the Court stated:

> There are undoubtedly many statutory requisitions intended for the guide of officers in the conduct of business devolved upon them, which do not limit their power or render its exercise in disregard of the requisitions ineffectual. Such generally are regulations designed

(continued...)

- 15 -

We must then ask if the regulation proscribes agency action which by its nature is for the benefit of the agency's orderly transaction of business, or whether it confers a benefit on the plaintiffs. The plaintiffs maintain the "purpose of the reference letter requirement . . . is to ensure that the nominees in fact represent the interests they claim to, and that they are qualified to represent them." (Appellants' Br. at 18). In essence, the plaintiffs argue the purpose of the requirement is to provide the agency with needed information. It is not uncommon for the "internal procedure" exception enunciated in Black Ball Freight to be applied in situations where the regulation specifies the content of submissions to the agency. See e.g., United States v. Caceres, 440 U.S. 741, 754 n.18 (1979); Central Freight Lines, Inc. v. United States, 669 F.2d 1063, 1070 (5th Cir. 1982) (procedural rules designed for processing applications may be relaxed or waived).

Here, the agency's regulations do not state how the Secretary is to assess the letters of reference or what weight should be given to those letters. They may well establish an applicant's bona fides as a member of or spokesman for an interest group. On the other hand, they may only provide a starting place for the

³(...continued)
   to secure order, system, and dispatch in proceedings, and by a disregard of which the rights of parties interested cannot be injuriously affected. Provisions of this character are not usually regarded as mandatory unless accompanied by negative words importing that the acts required shall not be done in any other manner or time than that designated.

Id. at 511.

- 16 -

Secretary's background inquiry. The regulations do not limit the Secretary's information gathering solely to reference letters. In fact, the plaintiffs allege the Governor was contacted about his nominees by the Bureau of Land Management Colorado State Director before she made her recommendation to the Secretary. Thus, additional information regarding the nominees was acquired through at least one avenue. Presumably, unsolicited letters from interest groups would also be considered. Moreover, the quality and legitimacy of the person or organization authoring the letter of reference requires evaluation. At bottom the appointment decision is left to the Secretary's discretion, subject only to the ultimate result that a "fair balance of membership" be achieved. Therefore, as in Black Ball Freight, the regulation here is not intended to confer important procedural benefits on a party; it is, instead, a procedural aid for the benefit of the agency.[4]

We next inquire whether the plaintiffs were substantially prejudiced by the agency's acceptance of the Governor's nominations without an accompanying letter of reference from the interest or organization to be represented. This question is more accurately phrased in this case as whether the acceptance of the nominees' applications without the letters of reference denied the plaintiffs a fair opportunity to be appointed to a position on the RAC. Only two plaintiffs identified a direct

---

[4] Even if we were to construe the regulatory language requiring letters of reference to somehow bestow benefits on the applicant pool another mandatory requirement of the same section would come into play. The regulations provide: "[T]he Secretary shall consider nominations made by the Governor . . . ." 43 C.F.R. § 1784.6-1(e). Somehow the procedural requirement for letters of reference would have to accommodate the positive command to consider the Governor's nominations.

interest in the appointment process, Houdek and Peters. This is not a situation where the Secretary prevented the plaintiffs from submitting relevant information that would promote their candidacies. Rather, their applications comprised two of approximately fifty applications submitted with an accompanying letter of reference. In other words, had the Secretary not accepted the ten nominees who did not have letters of reference from an interest or organization, the remaining nominees would have had one chance in fifty, as opposed to one chance in sixty, for appointment to the RAC. We do not find this difference amounts to substantial prejudice to the applicants who submitted letters of reference. Therefore, the regulation at issue in Count One of plaintiffs' complaint falls within the exception enunciated in *Black Ball Freight*, and is not reviewable by the court.

B.      Count 2: Alleged Violations of Prohibition Against Inappropriate Influence

The second claim in the plaintiffs' complaint is that the agency permitted Governor Owens inappropriately to influence the appointment process by allowing him to control a significant number of advisory committee members on the RACs in violation of the FACA, 5 U.S.C. app. 2 § 5(b)(3). As with Count 1, the plaintiffs sued under the APA, arguing that by failing to abide by the requirements of the FACA, the Secretary's appointments to the RACs were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The district court dismissed this count because it concluded that 5

U.S.C. app. 2 § 5 was too vague and, therefore, did not provide judicially administrable standards.

Again, we must apply the <u>Heckler v. Chaney</u> test to determine whether "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." 470 U.S. at 830. We conclude that there is no meaningful standard of review provided in the statute and that the district court accordingly did not err in dismissing this count of the complaint.

Section 5(b) of the FACA sets forth a number of requirements relating to the composition and operation of advisory committees:

> (b) . . . . Any such legislation [authorizing the establishment of an advisory committee] shall—
>> (1) contain a clearly defined purpose for the advisory committee;
>> (2) require the membership of the advisory committee to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee;
>> (3) contain appropriate provisions to assure that the advice and recommendations of the advisory committee <u>will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment</u> . . . .

5 U.S.C. app. 2 § 5(b)(1)–(3) (emphasis added). The requirements of § 5(b)(3) are made applicable to agencies by § 5(c), which states: "To the extent they are applicable, the guidelines set out in subsection (b) of this section shall be followed by the President, agency heads, or other Federal officials in creating an advisory committee." 5 U.S.C. app. 2 § 5(c).

- 19 -

We conclude that § 5(b)(3) does not provide a meaningful standard of review for a court to apply. We are not concerned here with the phrase "appointing authority" because the appointing authority is the Secretary of the Interior and plaintiffs do not allege that the Secretary is inappropriately influencing the RAC's independent judgment. Instead, plaintiffs argue that Governor Owens is a "special interest" who, by virtue of his sponsorship of such a large group of nominees to these RACs has "inappropriate influence" over the independent judgment of these RACs.

The problem we have with this claim centers on the word "inappropriate." The very structure of the statute and regulations calls for various special interest groups to recommend candidates for appointment to the RACs that will be giving advice on issues of interest to the recommending entities. It goes without saying that the special interests will recommend nominees who agree with their point of view. That is why the statute and regulations require nominees from a variety of backgrounds – to get different perspectives expressed on the RAC. So, it is not only obvious, but is apparently desired, that the nominees would be aligned with, and hence influenced by, the special interest groups that recommended them. The question is, what does § 5(b)(1)-(3) mean when it prohibits only "inappropriate" influence? Would a call from the recommending entity to a nominee about an issue under consideration constitute "inappropriate" influence? One would doubt it, but

the statute does not give us any guidance as to when the line is crossed between appropriate and inappropriate influence. Perhaps bribes or threats from a recommending interest group to its nominee could be regarded as inappropriate influence, but there is no allegation of anything of that nature here and so we do not need to consider those extreme situations.

What is alleged here is simply that Governor Owens will have an inappropriate amount of influence over these RACs by virtue of having nominated or endorsed such a large percentage of the membership of these RACs. But whether Congress intended that kind of hypothetical future influence to be inappropriate, and hence illegal under § 5(b)(3), is something as to which we have absolutely no guidance, guidelines or standards from Congress. Thus, we hold that plaintiffs' claim under § 5(b)(3) is not justiciable. In this regard, we disagree with the Fifth Circuit in Cargill, Inc. v. United States, 173 F.3d 323, 339 n. 30 (5th Cir. 1999), which held that claims under § 5(b)(3) were justiciable.

Plaintiffs' concern about inappropriate influence arising from an interest group sponsoring a disproportionate number of nominees to an RAC should, instead, be addressed under 43 C.F.R. § 1784.2-1(a), which requires a "fair membership balance" in the RAC. That is the substance of plaintiffs' third claim, and it is that claim to which we now turn.

C. Count 3: Alleged Violations of the Requirement of Fair Membership Balance in Representation

The plaintiffs' third claim in their complaint is that the agency failed to abide by its regulation requiring that advisory committees have a "fair membership balance." 43 C.F.R. § 1784.2-1(a). As with Counts 1 and 2, the plaintiffs brought their claim under the APA, 5 U.S.C. § 706(2)(A), and the district court dismissed the count because the regulation was too vague to provide a meaningful standard of review. We conclude that this regulation is justiciable.

Section 1784.2-1(a) states:

Each advisory committee shall be structured <u>to provide fair membership balance, both geographic and interest-specific, in terms of the functions to be performed and points of view to be represented</u>, as prescribed by its charter. Each shall be formed with the objective of providing representative counsel and advice about public land and resource planning, retention, management and disposal.

43 C.F.R. § 1784.2-1(a) (emphasis added). The regulation was promulgated pursuant to FACA, <u>see</u> 43 C.F.R. § 1784.0-3(a), and the emphasized portion closely tracks the language of FACA's § 5(b)(2), which requires that advisory committees be "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee." 5 U.S.C. app. 2 § 5(b)(2). In addition, in a section speaking specifically about the RACs, the BLM regulations say that "[i]n appointing members of a [RAC] from the 3 categories set forth in [§ 1784.6-

- 22 -

1(c)(1), (c)(2), and (c)(3)] . . . the Secretary shall provide for balanced and broad representation from within each category." 43 C.F.R. § 1784.6-1(d).

There is no case law addressing the precise question whether the fair balance requirements of 43 C.F.R. §§ 1784.2-1(a) and 1784.6-1(d) are justiciable. However, several courts have addressed the question whether the analogous fair balance provision in 5 U.S.C. app. 2 § 5(b)(2) is justiciable. The Fifth and D.C. Circuits have held that the fair balance requirement of § 5(b)(2) is justiciable, and no court of appeals has held to the contrary. See Cargill, 173 F.3d at 335; Public Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods, 886 F.2d 419, 423-25, 433 (D.C. Cir. 1989) (majority agreeing that § 5(b)(2) is justiciable). The Eleventh Circuit also has strongly suggested that § 5(b)(2) is justiciable by upholding a district court's injunction imposed to remedy violations of § 5(b).[5] Alabama-Tombigbee Rivers Coalition v. Dep't of Interior, 26 F.3d 1103, 1106–07 (11th Cir. 1994). We find these cases to be persuasive authority for the instant case.

We therefore adopt the reasoning of the Fifth and D.C. Circuits and apply it to the fair balance requirement of 43 C.F.R. §§ 1784.2-1(a) and 1784.6-1(d). The

---

[5] In Alabama-Tombigbee, the Eleventh Circuit reviewed whether a district court could issue an injunction to remedy violations of § 5(b). 26 F.3d at 1104. The court listed the § 5 provisions, but it did not specify which of them the district court concluded had been violated. See id. at 1106-07.

BLM regulations are not "[one of] those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410 (1971) (internal quotation marks omitted). As Judge Edwards wrote in Microbiological Criteria:

> It does not matter that the "fairly balanced" requirement falls short of mathematical precision in application, or that it may involve some balancing of interests by the agency. The presumption in favor of judicial review is not altered in the face of a diffuse statutory directive. Indeed, this [is] one of the principal points of the Supreme Court's decision in Overton Park. In that case, the Court allowed a suit under a statute that prohibited the Secretary of Transportation from authorizing the use of federal funds to finance the construction of highways through public parks if a "feasible and prudent" alternative route exists and allowed construction through parks only if there has been "all possible planning to minimize harm" to the park. Overton Park, 401 U.S. at 411 . . . . The "feasible and prudent" and "minimize harm" standards involved a significant and ill-defined weighing of interests by the agency, just as does the "fairly balanced" standard in this case. However, as the Court made clear, this did *not* mean that there was "no law to apply." Id. at 410–13 . . . . While the difficulty of determining what precisely constitutes a "fair balance" may incline courts to be deferential in reviewing the composition of advisory committees and may defeat a plaintiff's claims in a given case, this cannot be grounds for refusing to enforce the provision altogether.

Microbiological Criteria, 886 F.2d at 434 (Edwards, J., concurring in part and dissenting in part).

Compared to the statutes at issue in Overton Park and Microbiological Criteria, which provided "law to apply" even though they required "ill-defined weighing of interests," the BLM regulations provide a more precise standard for determining what constitutes a fair balance of interests on the RACs. Section

- 24 -

1784.6-1(c) requires that appointees to RACs be representative of three general groups, each of which is comprised of specific subgroups: (1) people with interests in federal grazing permits, transportation or rights-of-way, outdoor recreation, commercial timber operations, or energy and mineral development; (2) people representing nationally or regionally recognized environmental groups, "dispersed recreational activities," archeological and historical interests, or wild horse and burro interest groups; and (3) persons who hold state, county or local elected office, are employed by state natural resources agencies, represent local Indian tribes, are employed as academics in natural resource management or the natural sciences, or represent the public-at-large.  43 C.F.R. § 1784.6-1(c)(1)–(3).  The regulations state that "the Secretary shall provide for balanced and broad representation from within each category" of interests described in § 1784.6-1(c). 43 C.F.R. § 1784.6-1(d).  Thus, whereas under § 5(b)(2) a court must determine what interests should be represented in light of the purpose and functions of the advisory committee before deciding whether those interests are fairly represented, see Cargill, 173 F.3d at 336, 337, under § 1784.6-1(c) the court knows which categories of interests are entitled to representation on the RACs.

In fact, the BLM regulations do more than simply list the interest groups that are to be represented on the RACs.  The regulations require that RACs be organized consistent with one of three models described in 43 C.F.R. § 1784.6-2.  The three

models differ in terms of what jurisdiction the RAC covers, what constitutes a quorum for conducting RAC business, and what subgroups may be formed to work under the RAC. See 43 C.F.R. § 1784.6-2(a)(1), (a)(2), and (a)(3). Most relevant for our purposes, however, is how this section specifies the membership requirements for each model RAC. Under Model A, "[e]ach council shall have 15 members, distributed equally among the 3 interest groups specified in § 1784.6-1(c)." 43 C.F.R. § 1784.6-2(a)(1)(ii). Model B is more precise, consisting of "15 members, distributed equally among the 3 interest groups specified in § 1784.6-1(c), and will include at least one representative from wildlife interest groups, grazing interests, minerals and energy interests, and established environmental/conservation interests. The Governor [of the covered state] shall chair the council." 43 C.F.R. § 1784.6-2(a)(2)(ii). Model C states that "[m]embership of the council shall be 10 to 15 members, distributed in a balanced fashion among the 3 interest groups defined in § 1784.6-1(c)." 43 C.F.R. § 1784.6-2(a)(3)(ii). In requiring equal representation of the three groups defined in § 1784.6-1(c), Models A and B require that five members of the fifteen-member RAC be drawn from each interest group. Model C requires "balanced" representation from among the three interest groups because RACs under the model may have 10, 11, 13, or 14 members, sizes that do not permit equal representations from among the three groups. Still, balanced representation under Model C at least

- 26 -

requires that none of the interest groups be significantly over-represented compared to the others.

For the foregoing reasons, we hold that the "fair balance" requirement of 43 C.F.R. §§ 1784.2-1(a) and 1784.6-1(d) is justiciable and the district court erred in dismissing Count 3 of the complaint.

## II. Standing

Having concluded that 43 C.F.R. §§ 1784.2-1(a) and 1784.6-1(d) provides a justiciable legal standard, we now consider whether the plaintiffs have standing to raise that claim. We review questions of standing *de novo*. Catron County Bd. of Comm'rs v. United States Fish & Wildlife Serv., 75 F.3d 1429, 1433 (10th Cir. 1996).

Article III of the Constitution limits the exercise of judicial power to "Cases" and "Controversies," and the core doctrine of standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). A plaintiff must establish three elements to satisfy the minimum constitutional requirements of standing. First, the plaintiff must have experienced an "injury in fact," that is, an invasion of a legally protected interest that is "concrete and particularized" and "actual or imminent."

Id. Second, "there must be a causal connection between the injury and the conduct complained of." Id. Third, it must be likely, not speculative, that the injury will be redressed by the trial court's favorable decision. Id. at 561. The plaintiffs have the burden of alleging facts establishing these three elements. See Utah v. Babbitt, 137 F.3d 1193, 1202 (10th Cir. 1998).

Because neither the FLPMA nor the FACA contains a private right of action for those seeking to enforce the procedural requirements attending the creation and operation of federal advisory committees, the plaintiffs rely upon the judicial review provisions of the Administrative Procedure Act as the basis for their district court action.[6] "Consequently, in addition to the Article III standing requirements, Plaintiffs must also meet the statutory standing requirements of the APA: Plaintiffs must show there has been some final agency action and must demonstrate that [their] claims fall within the zone of interests protected by the statute forming the basis of [their] claims." Babbitt, 137 F.3d at 1203 (internal footnote and quotation marks omitted) (alterations in original); Committee to Save the Rio Hondo v. Lucero, 102 F.3d 445, 448 (10th Cir. 1996).

---

[6]Section 10(a) of the APA provides: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

We find standing here based on the individual plaintiffs' claim of an interest in a fair opportunity to be appointed to an RAC which opportunity was denied them when the Secretary of the Interior short-circuited the "fair balance" requirement.

Sarah Peters and Joshua Houdek assert damage to their personal interests in a right to a fair chance to be appointed to an RAC. See the Appellant Brief at p. 42 ("Like a contractor who discovered, after not being awarded the contract, that the process was rigged and the contract winner had not even submitted a proper bid, [the plaintiffs] suffered concrete and actual harm in that the process they participated in was tainted.").

Standing predicated upon denial of a fair opportunity to compete for a position or contract is well established in the law. In Regents of University of California v. Bakke, 438 U.S. 265, 281 n. 14 (1978), the Supreme Court concluded that Bakke had standing to complain that the affirmative action program at the University of California deprived him of a fair opportunity for admission to the medical school even though he had not clearly established that he would have been selected in the absence of the challenged affirmative action program. The Supreme Court concluded:

> [E]ven if Bakke had been unable to prove that he would have been admitted in the absence of the special program, it would not follow that he lacked standing. The constitutional element of standing is plaintiff's demonstration of any injury to himself that is likely to be redressed by favorable decision of his claim. The trial court found such an injury, apart from failure to be admitted, in the University's

decision not to permit Bakke to compete for all 100 places in the class, simply because of his race. Hence the constitutional requirements of Art. III were met. The question of Bakke's admission *vel non* is merely one of relief.

Id. (emphasis added; citations omitted).

Following Bakke, the Supreme Court again had the opportunity to consider the issue of standing in the context of an allegation of loss of opportunity to compete in the case of Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville, 508 U.S. 656, 664-66 (1993). In Northeastern Florida Contractors, the Supreme Court held that a non-minority contractor had standing to complain about an affirmative action provision that set aside ten percent of the amount spent on City contracts for minority contractors. The court concluded that a non-minority contractor had alleged a sufficient injury for standing in that the set aside deprived that contractor of an opportunity to compete for that portion of the City's business that was set aside for minority contractors. The Court concluded:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing.

Id. at 666; see also Turner v. Fouche, 396 U.S. 346, 362 (1970) ("We may assume that the [plaintiffs] have no right to be appointed to the . . . board of education. But [they] do have a federal constitutional right to be considered for public service

- 30 -

without the burden of invidiously discriminatory disqualifications" (footnote omitted).) Cf. Clements v. Fashing, 457 U.S. 957, 962 (1982) (Office holders stated a justiciable claim challenging a provision of the Texas constitution which required immediate resignation from office before the officer holder could run for another office even though the plaintiffs had not established that they had, in fact, announced their candidacy for another office.).

We reached the same conclusion in Clajon Production Corp. v. Petera, 70 F.3d 1566, 1572-74 (10th Cir. 1995). There we held that a landowner would have standing to challenge a state hunting license provision which arguably disadvantaged the landowner's opportunity to attract out-of-state hunters, but the claim in that particular case ultimately failed because of a failure to present evidence of the mechanism by which the plaintiff's opportunity to attract out-of-state hunters was diminished.

At the preliminary pleading stage, which is the stage of this matter as presented on appeal, Peters and Houdek have alleged that their opportunities for appointment to the relevant RACs were diminished by the inappropriate dominance of the nomination process by one interest group – Governor Owens representing the State of Colorado. It is a fair inference from their allegations that if the "fair membership balance" provision of 42 C.F.R. §§ 1784.6-1(d) and 1784.2-(1)(a) had

been observed, more positions on the RACs would have been available to be filled by interest groups such as the ones that recommended them.

At this stage in the proceedings, we do not address whether Peters and Houdek ultimately can prove injury sufficiently to establish standing. However, we believe at the pleadings stage that there is enough to allow this matter to proceed on their behalf.

Because we believe that this standing interest in a fair opportunity to be appointed to an RAC is unique to Peters and Houdek, we do not extend it to the Colorado Environmental Coalition or the Colorado Mountain Club. The positions sought on the relevant RACs were to be held by individuals, not organizations. In fact, as noted in our discussion of the justiciability of a claim under 5 U.S.C. app. 2 § 5(b)(3), the special interest recommending individuals are precluded from having an "inappropriate influence" over the individuals nominated. Thus, this particular theory of standing is availing only to Peters and Houdek.

## CONCLUSION

We conclude that 43 C.F.R. § 1784.6-1(e) (letters of reference requirement) and 5 U.S.C. app. 2 § 5(b)(3) (prohibition against inappropriate influence by special interests) do not provide meaningful standards by which plaintiffs' claims

- 32 -

may be evaluated and hence plaintiffs' claims relying on those provisions are not justiciable. Accordingly, we AFFIRM the district court's dismissal of those claims in counts one and two. However, we conclude that the "fair membership balance" provision of 43 C.F.R. §§ 1784.2-1(a) and 1784.6-1(d) does provide an adequate standard to permit judicial review and a claim under that provision is justiciable. Hence we REVERSE the district court's dismissal of count three. We conclude that Peters and Houdek, but not the institutional plaintiffs, have standing to assert the claim in count three (alleging a violation of the "fair membership balance" provision of 43 C.F.R. §§ 1784.2-1(a) and 1784.6-1(d)). We REMAND this matter to the district court for further proceedings on count three as to plaintiffs Peters and Houdek.

02-1254, <u>Colorado Environmental Coalition v. Wenker</u>
**EBEL,** Circuit Judge, dissenting from Section I.A., and dissenting in part and concurring in Section II on standing:

I dissent from Section I.A. of this opinion and would find justiciability under 43 C.F.R. § 1784.6-1(e).

As to Section II on standing, I join the opinion of the court, except that I believe there is an additional basis for standing for Houdek and for the institutional plaintiffs Colorado Environmental Coalition and Colorado Mountain Club based on their user interest in the affected property.

1. <u>The Individual Plaintiffs' Standing</u>

The individual plaintiffs are Sarah Peters and Joshua Houdek. Peters and Houdek were both nominated to and applied for positions on the Colorado RACs. Mr. Houdek is the Outdoor Program Coordinator at Mesa State College in Grand Junction, Colorado. The record contains no information about Ms. Peters's background. The complaint states that they both submitted their applications by the due date, and each application was accompanied by a letter of recommendation from the interests each would represent. Neither was appointed to a RAC.

a. <u>Injury in Fact</u>

Peters and Houdek allege that they have been injured by the failure of the Secretary to adhere to the appointment procedures established by FACA and the

BLM regulations promulgated thereunder. The Supreme Court has recognized that plaintiffs may suffer an injury in fact when an agency fails to follow specific procedural requirements. Defenders of Wildlife, 504 U.S. at 572–73 & nn.7–8; see also Babbitt, 137 F.3d at 1215–16. Plaintiffs can establish that they have suffered an injury in fact based on alleged procedural irregularity when they "seek[] to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs . . . ." See Defenders of Wildlife, 504 U.S. at 572. To challenge an agency's procedural failing, a plaintiff must show that he or she has a concrete interest, that the procedures at issue were designed to protect that interest, and that the procedural irregularity threatens the plaintiff's concrete interest. Defenders of Wildlife, 504 U.S. at 573 n.8; Babbitt, 137 F.3d at 1215–16. I conclude that one of the individual plaintiffs, Houdek, has met this standard.

I find that Houdek has a concrete interest. In environmental cases in which plaintiffs seek standing for alleged procedural failures by an agency, courts find that plaintiffs establish "concrete interests" by showing a "geographical nexus" to, or actual use of, the land potentially affected by the agency action (or inaction). See, e.g., Committee to Save the Rio Hondo, 102 F.3d at 449 (holding that "[t]o demonstrate that the increased risk of harm injures the plaintiff's concrete interests, the litigant must establish either its 'geographical nexus' to, or actual use of the site" such that it may suffer environmental consequences from the agency's action);

Public Citizen v. Dep't of Transp., 316 F.3d 1002, 1015 (9th Cir. 2003) (holding that to show a concrete interest, "environmental petitioners must allege that they will suffer harm by virtue of their geographic proximity to the situs of the claimed pollution"); Sabine River Auth. v. United States Dep't of Interior, 951 F.2d 669, 674 (5th Cir. 1992) (holding that procedural injury must be alleged by a plaintiff "'having sufficient geographical nexus to the site of the challenged project [such that they can] expect [] to suffer whatever environmental consequences the project may have'") (alterations in original) (quoting City of Davis v. Coleman, 521 F.2d 661, 671 (9th Cir. 1975)).  Houdek is a user of lands in Colorado managed by the BLM both in his professional and personal capacity. His application for a position on one of the RACs indicates that he participates in "rock climbing, hiking, mountain biking, kayaking, rafting, and backcountry skiing" in, and manages a college outdoor recreation program that uses public lands overseen by the RAC for the Northwest region of Colorado.  Therefore, Houdek has a concrete interest in the regulations promulgated by the BLM for the management of federal lands in Colorado.

By contrast, there is no evidence in the complaint or the record which establishes that Peters has a concrete interest that can be affected by BLM land use decisions.  She has provided no information linking her to BLM lands over which the Colorado RACs have authority for making recommendations.  Because I cannot

- 3 -

conclude that Peters has a geographical nexus to or actually uses lands managed by the BLM in Colorado, she has failed to carry her burden of establishing a concrete interest threatened by the defendants' alleged procedural failings under this theory of standing.

I also find that the procedures that Houdek alleges the defendants failed to follow "are designed to protect [his] threatened concrete interest . . . ." Defenders of Wildlife, 504 U.S. at 573 n.8. The purpose of §§ 1784.2-1(a) and 1784.6-1(d) (requiring balanced and broad representation in RAC membership of three specified groups with interests in federal lands), is to protect the interests of recognized users of federal lands by ensuring that their interests are considered in BLM decision making. See National Anti-Hunger Coalition v. Executive Comm. of the President's Private Sector Survey on Cost Control, 711 F.2d 1071, 1074 n.2 (D.C. Cir. 1983) ("[T]he legislative history makes clear . . . [that] the 'fairly balanced' requirement [of § 5(b)(2) of FACA] was designed to ensure that persons or groups directly affected by the work of a particular advisory committee would have some representation on the committee."). By requiring that the RACs include balanced representation of three recognized categories of users of federal lands, these regulations create a mechanism by which the BLM is informed about how the consequences of its land use decisions will affect those users.

Finally, I conclude that the defendants' failure to abide by the fair balance requirement creates the kind of threat to Houdek's concrete interest that constitutes an injury in fact for the purposes of standing. The crux of Houdek's argument is that there is an increased risk that his uses of federal lands will be injured because the BLM will be making decisions about how those lands are managed without receiving broad-based advice about the consequences those decisions will have on users like Houdek. He claims that the advice provided by the improperly appointed RACs "is skewed in favor of political or business interests or against recreational interests."

Increased risk of environmental harm to the lands he uses can constitute an injury in fact sufficient to support standing. Other courts, including our own, have reached this conclusion in the closely analogous context in which plaintiffs allege an injury in fact because an agency failed to prepare an environmental impact statement required by the National Environmental Policy Act. For example, in Rio Hondo we said:

> An agency's failure to follow the National Environmental Policy Act's prescribed procedures creates a risk that serious environmental consequences of the agency action will not be brought to the agency decisionmaker's attention. The injury of an increased risk of harm due to an agency's uninformed decision is precisely the type of injury [NEPA] was designed to prevent. Thus, under [NEPA], an injury of alleged increased environmental risks due to an agency's uninformed decisionmaking may be the foundation for injury in fact under Article III.

102 F.3d at 448–49; see also Sabine River Auth., 951 F.2d at 674 ("'The procedural injury implicit in agency failure to prepare an [environmental impact statement]—the creation of a risk that serious environmental impacts will be overlooked—is itself a sufficient 'injury in fact' to support standing . . . .'") (quoting Coleman, 521 F.2d at 671).

Because the purpose of the procedural requirements imposed by the BLM regulations is to ensure that the interests of specific groups of federal land users are presented to the BLM by the RACs, alleged increased risks of environmental injury due to the defendants' failure properly to appoint representative members to the RACs can constitute an injury in fact. See Cargill, 173 F.3d at 329–30 (finding injury in fact where violation of FACA would increase the likelihood that an advisory committee's research would be inaccurate and the study would be used to justify regulation of plaintiffs' industry); Nat'l Anti-Hunger Coalition, 711 F.2d at 1074 n.2 (dictum) ("When [FACA's fair balance] requirement is ignored, therefore, persons having a direct interest in the [advisory] committee's purpose suffer injury-in-fact sufficient to confer standing to sue.").

b.    Causal Connection

"To establish causation, a plaintiff must show its injuries are fairly traceable to the conduct complained of." Committee to Save the Rio Hondo, 102 F.3d at 451 (citing Defenders of Wildlife, 504 U.S. at 560–61). Causation is clearly made out

in this case. Houdek's injury results not from any specific decision of the agency regarding Colorado federal lands, but from the agency's uninformed decision making. It is irrelevant that BLM decisions affecting Colorado public lands relying upon advice from the improperly constituted RACs in fact might not impair Houdek's use of those lands. Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1355 n.14 (9th Cir. 1994) ("There is no requirement that a plaintiff prove that an injury to his or her concrete interest *will* occur.") (emphasis in original). The injury is the *risk* that potential environmental damage will be overlooked by the BLM. Cf. Committee to Save the Rio Hondo, 102 F.3d at 452 ("Under the National Environmental Policy Act, an injury results not from the agency's decision, but from the agency's *uninformed* decisionmaking.") (emphasis in original); Salmon River Concerned Citizens, 32 F.3d at 1355 (same). The purpose of the appointment procedures is to ensure that the interests of land users like Houdek are represented in BLM decision making. Houdek's allegation that the RACs are not adequately representative is fairly traceable to the alleged failure by the agency properly to appoint members to the RAC. Thus, Houdek has sufficiently established causation at this stage of the litigation.

c.     Redressability

Ordinarily, when a plaintiff challenges an agency's failure to follow required procedures, the standard for showing redressability is relaxed.  The Supreme Court has said that "[t]he person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."  Defenders of Wildlife, 504 U.S. at 573 n.7; see also Committee to Save the Rio Hondo, 102 F.3d at 452; Babbitt, 137 F.3d at 1216 n.37.  "For example, the plaintiff need not establish with certainty that adherence to the procedures would necessarily change the agency's ultimate decision." Babbitt, 137 F.3d at 1216 n. 37.  Houdek thus need not show with certainty that had the selection procedures been complied with he would have been appointed to a RAC, or even that different people would have been chosen.

But even without the relaxed standard employed in cases alleging procedural injury, I would find the redressability prong of standing to be satisfied.  Houdek's claim is that he was injured by the failure of the Secretary to follow appropriate procedures in making the appointments.  This injury is easily remedied by enjoining the RACs from meeting until improperly appointed nominees have been replaced by nominees whose appointments follow the required procedures.  Cf. id. at 1216 ("Plaintiffs have requested that Defendants be enjoined from imposing the de facto standard at least until they comply with FLPMA by formally amending the land use

plan and providing for notice and comment. Thus, Plaintiffs' injuries are redressable by a favorable decision.")

### d. APA Standing Requirements

By bringing their claims under the APA, the plaintiffs must carry an additional burden to establish standing. They must identify some "final agency action" that is the source of their injury, and they must demonstrate that their claim falls within the zone of interests protected by the laws forming the basis for their claims. Catron County, 75 F.3d at 1434. The agency action complained of here is the appointment by the Secretary of the challenged members of the Colorado RACs. This constitutes final agency action under the APA. See 5 U.S.C. § 551(13) (defining "agency action" to be "the whole or part of an agency . . . order . . . ."); id. at § 551(6) (defining "order" to be "the whole or part of a final disposition . . . . of an agency in a matter other than rule making but including licensing"). In addition, as the discussion above concerning injury in fact indicates, Houdek's procedural injury falls directly within the zone of interests protected by the FACA and the BLM regulations. The FACA and BLM regulations are designed to ensure that advisory committees like the RACs are independent, representative, and accountable. The plaintiffs' claim is that by failing to follow the stated procedures, the defendants' actions directly subvert the precise interests the FACA and the

regulations seek to protect. I conclude, therefore, that the plaintiffs satisfy the APA standing requirement, at least at this pleading stage.

### 2. The Organizational Plaintiffs

Having found that one of the individual plaintiffs has standing, I turn to whether the organizational plaintiffs—the Colorado Environmental Coalition and the Colorado Mountain Club—have standing.

Although "[a] plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties," Warth v. Seldin, 422 U.S. 490, 499 (1975), it is well established that associations may have standing to sue on behalf of their members if a three-part test is met: (1) the association's members would otherwise have standing to sue in their own right; (2) the interests the association seeks to protect are germane to the association's purpose; and (3) neither the claim asserted nor the relief requested requires that individual members of the association participate in the lawsuit. Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977); Kansas Health Care Ass'n v. Kansas Dep't of Soc. & Rehab. Servs., 958 F.2d 1018, 1021 (10th Cir. 1992).

The Colorado Environmental Coalition and the Colorado Mountain Club, the organizational plaintiffs in this case, satisfy the test for standing by an association.

First, the members of each organization would have standing to sue individually. Like individual plaintiff Houdek, members of the CEC and CMC use BLM lands that are influenced by RAC proposals for outdoor recreation of all kinds, in addition to scientific and commercial uses. Thus, the members of the CEC and CMC share the same risk to their interests in the BLM lands that Houdek does: that by failing to follow required procedures in appointing RAC members, the BLM may make uninformed land use decisions that impair the use of public lands by members of the CEC and CMC. Moreover, the same analysis with regard to causation, redressability, and the APA standing requirements that individual plaintiff Houdek satisfies are satisfied by the individual members of the CEC and CMC because they stand in the same relation as Houdek to the BLM.

Second, seeking to enforce the procedural requirements for appointments to the RACs is germane to the purpose of the CEC and CMC. The purpose of those organizations is to preserve, protect, and appropriately manage the use of Colorado wilderness areas, including those lands managed by the BLM. Obviously, the formulation of appropriate BLM policy for those lands is germane to their purpose. These organizations have a direct and self-evident interest in the representativeness of the RACs and the land use policies formulated by the BLM.

Third, the declaratory and injunctive relief that would remedy the CEC's and CMC's claims in this case would not require the participation of individual

members.  Such relief would be directed toward the agency and require it to reappoint the RAC members after correctly following the requirements of the FACA and BLM regulations.

In discussing the standing of the CEC and CMC, the plaintiffs and the defendants address the constitutionally required elements of standing for individual plaintiffs: whether there is an injury in fact, causation, and redressability.  This analysis is, however, unnecessary.  The test for associational standing incorporates these three elements into the first part of its test—whether an individual member of the organization would have standing to sue.  As we have said, the test for associational standing "takes into account both the constitutional dimension of standing and also the concern that the association properly represent its members in the particular suit."  Kansas Health Care Ass'n, 958 F.2d at 1021.  If the association satisfies the three- part test for associational standing, the inquiry is complete and the group has standing.  See, e.g., Roe #2 v. Ogden, 253 F.3d 1225, 1230 (10th Cir. 2001) (concluding that association has standing once the three-part test is met); NCAA v. Califano, 622 F.2d 1382, 1387 (10th Cir. 1980) (same).